IN THE UNITED STATES DISTRCT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAIL GOLDBERG,                           )
      Plaintiff-Appellant          )          **Judge Joan B. Gottschall**
                                   )          **Case No. : 08 C 2808**
      v.                           )
ERNEST J. OJEDA,                          )
BEVERLY V. OJEDA,                         )
      Defendants-Appellees  )

## NOTICE OF FILING

To:    Carol Sales, Esq.
       Paul Bauch, Esq.
       Bauch & Michaels, LLC
       53 W. Jackson, Suite 1115
       Chicago, Illinois 60604

     **PLEASE TAKE NOTICE** that on July 25, 2008, we electronically filed with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, *Brief of Plaintiff-Appellant*, a copy of which is served upon you.

Joseph L. Matz (1797093)               Respectfully submitted,
Stuart Gimbel (6194321)
Alon Stein (6278515)                    **GAIL GOLDBERG**
KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP            s/s <u>Alon Stein</u>
7250 N. Cicero Avenue, Ste. 200       One of her attorneys
Lincolnwood, Illinois  60712
(847) 982-1776

## CERTIFICATE OF SERVICE

     Alon Stein, an attorney, on oath, certifies that he caused a copy of *Brief of Plaintiff-Appellant*, to be served upon counsel of record below:

       Carol Sales, Esq.
       Paul Bauch, Esq.
       Bauch & Michaels, LLC
       53 W. Jackson, Suite 1115
       Chicago, Illinois 60604

by electronic means this 25th day of July, 2008.

                         s/s <u>Alon Stein</u>

IN THE UNITED STATES DISTRCT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAIL GOLDBERG,                                )
      Plaintiff-Appellant          )          **Judge Joan B. Gottschall**
                                      )          **Case No. :  08 C 2808**
      **v.**                                )
**ERNEST J. OJEDA,**                     )
**BEVERLY V. OJEDA,**                   )
      Defendants-Appellees         )

Appeal from the United States Bankruptcy Court for the
Northern District of Illinois, Eastern Division
The Honorable Judge John H. Squires
No. 07-A-00192

### BRIEF OF PLAINTIFF-APPELLANT

**Stuart Gimbel**
**Alon Stein**
**Kamensky Rubinstein**
**Hochman & Delott, LLP**
**7250 N. Cicero Avenue**
**Suite 200**
**Lincolnwood, IL 60712**
**(847) 982-1776**
*Attorneys for Plaintiffs-Appellants*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1

ISSUES PRESENTED .........................................................................................1

STANDARD OF APPELLATE REVIEW ...........................................................2

STATEMENT OF THE CASE ............................................................................2

    A.    Nature of the Case ..............................................................................2

    B.    Statement of Facts ..............................................................................2

    C.    Course of Proceedings/Disposition in Court Below ......................11

SUMMARY OF ARGUMENT ..........................................................................13

ARGUMENT ......................................................................................................16

I.     THE DISTRICT COURT ERRED WHEN IT FOUND THAT GAIL'S
      RELIANCE ON THE MCDONALDS FRAUD WAS NOT
      JUSTIFIABLE ................................................................................16

II.    THE DISTRICT COURT ERRED WHEN IT FOUND THAT GAIL'S
      RELIANCE ON THE PAN AMERICAN BANK FRAUD WAS NOT
      JUSTIFIABLE ................................................................................23

III.   THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE
      AMOUNT OF NON-DISCHARGE DEBT IS LIMITED TO UNPAID
      INTEREST ......................................................................................25

CONCLUSION ..................................................................................................30

.

## TABLE OF CASES

*Bombardier v. Dobek (In re: Dobek)*, 287 B.R. 496, 508 (N.D. Ill. 2002)..............................16, 17

*Field v. Mans*, 516 U.S. 59 (1995)..........................................................................16, 17, 19, 24

*Field v. Mans*, 157 F.3d 35 (1st Cir. 1998)...................................................................................28

*Field v. Mans, (In re: Mans)*, 200 B.R. 293, 295 (D. N.H. 1996). ...............................................20

*First Bank of Elgin v. Niles*, 35 B.R. 409 (N.D. Ill. 1983) .................................................15, 18, 24

*Freer v. Beetler (In re: Beetler)*, 368 B.R. 720, 728 (C.D. Ill. 2007).........................25, 26, 27, 28

*John Deere v. Broholm*, 310 B.R. 864 (N.D. Ill. 2004)...........................................................16, 19

*Johnston v. Campbell (In re. Campbell)*, 372 B.R. 886 (C.D. Ill. 2007).......................................20

*McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir. 2000) ............................................................13

*Memorial Hosp. v. Sarama*, 192 B.R. 922, 927 (N.D. Ill. 1996).............................................21, 22

*Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (N.D. Ill. 1998)................................................20

*Schultz v. Schultz (In re Schultz)*, 204 B.R. 275 (D. Mass 1996) ..................................................2

*Sterna v. Paneras*, 195 B.R. 395, 406 (N.D. Ill. 1996)................................................................17

*Taylor v. Sykes*, 2005 U.S. Dist. LEXIS 34904 (N.D. Ill. 2005 .............................................21, 22

## STATUTE INVOLVED

11 USCS § 523 (a) (2) (A)

§ 523.  Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title [11 USCS § 727, 1141, 1228(a), 1228(b), or 1328(b)] does not discharge an individual debtor from any debt--

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
   (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

## JURISDICTIONAL STATEMENT

Gail Goldberg ("Gail") filed her Adversary Complaint For the Determination of the Dischargeability of Debt with the United States Bankruptcy Court for the Northern District of Illinois, pursuant to §523 of the United States Bankruptcy Code and Bankruptcy Rule 7001 (4) requesting that the Ojedas' debt to her in the amount of $600,000, plus attorneys fees, costs and accrued interest, be determined not dischargeable pursuant to section 523 (a) (2) (A) of the United States Bankruptcy Code (R. 1). On February 25 through 27, 2008 a trial was held before Judge John H. Squires. On April 22, 2008, Judge Squires entered a final judgment and order finding that the debt owed by the Ojedas to Gail is dischargeable and does not fall within the 11 U.S.C. § 523 exception to discharge. (R. 115).

This Court has jurisdiction pursuant to 28 U.S.C. § 158 (a) (1) and Rule of Bankruptcy Procedure 8001 (a), which provides for appeals as of right to the United States District Court from the final judgment, order or decree of a bankruptcy judge when a notice of appeal is timely filed. On May 1, 2008, Gail timely filed a Notice of Appeal and this matter was referred to this Court (R. 117).

## ISSUES PRESENTED

1.    Whether the Bankruptcy Court erred in finding that the debt owed by Defendants/Appellees to Plaintiff/Appellant is dischargeable and not excepted by 11 U.S.C. § 523 (a) (2) (A).

2.    Whether the Bankruptcy Court erred in finding that Gail did not meet the justifiable reliance element of proof required by 11 U.S.C. § 523 (a) (2) (A).

3.    Whether the Bankruptcy Court erred in finding that only unpaid interest from January 2006, plus attorney's fees and costs, are potentially non-dischargeable.

## STANDARD OF APPELLATE REVIEW

A bankruptcy court applies a preponderance of the evidence standard when making determinations regarding the dischargeability of debts under section 523(a). *Schultz v. Schultz (In re Schultz)*, 204 B.R. 275 (D. Mass. 1996). A reviewing district court must accept the findings of fact by a bankruptcy court unless those findings are clearly erroneous. *Id.* Conclusions of law are reviewed *de novo*. *Id.*

## STATEMENT OF THE CASE

**A      Nature of the Case**

Gail filed her Adversary Complaint For the Determination of the Dischargeability of Debt with the United States Bankruptcy Court for the Northern District of Illinois, pursuant to §523 of the United States Bankruptcy Code and Bankruptcy Rule 7001 (4). In her Complaint, Gail requested that the Ojedas' debt to her in the amount of $600,000, plus attorneys fees, costs and accrued interest, be excepted from discharge pursuant to section 523 (a) (2) (A) of the United States Bankruptcy Code, since extensions, renewals and forbearance of the debt had been obtained by false pretenses, false representations or actual fraud. (R. 1).

**B.      Statement of Facts**

Prior to August, 1998, a mutual friend introduced Ernest J. Ojeda ("Ernest Ojeda") and Beverly V. Ojeda ("Beverly Ojeda") (collectively, the "Ojedas") to Ronald ("Ronald") and Gail ("Gail") Goldberg (collectively, the "Goldbergs") for the purposes of obtaining a $600,000 loan for the Ojedas. (R. 113 at 2)

Prior to the Goldbergs' agreeing to loan funds to the Ojedas, the Ojedas represented to the Goldbergs that they were going to provide, as collateral, bank stock of Pan American Bank (or the "Bank")—the bank for which Ojeda was Chairman of the Board. (R. 113 at 2). The

Ojedas provided the Goldbergs with a personal financial statement, dated April 3, 1998, stating that they owned 160,000 shares of Bank stock, with a value of $800,000. (R. 41). That financial statement stated as follows:

> "Each undersigned understands that you are relying on the information provided herein (including the designation made as to ownership of property) in deciding to grant or continue credit. Each undersigned represents and warrants that the information provided is true and complete and that you consider this statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned.

(*Id*).

The Ojedas also informed the Goldbergs that they were the sole owners of two entities, Dices Enterprises and Pelham Enterprises, Incorporated ("Pelham"), which each owned and operated a McDonald's restaurant franchise in the Chicagoland area.

### The Ojedas Borrow $600,000 From the Goldbergs

Relying upon the Ojedas' representations relating to the Ojedas' ownership of the McDonald's restaurants and Ernest Ojeda's ownership interest in Pan American Bank, on or about August 6, 1998, the Goldbergs loaned $600,000 to the Ojedas at an annual interest rate of 18%. (R. 113 at 4). That loan was evidenced by a Secured Promissory Note (the "1998 Note") dated August 6, 1998, which was executed and delivered by the Ojedas. (R. 36). Pursuant to the 1998 Note, the loan was intended to be secured by 160,000 common shares of Pan American Bank stock. Also on or about August 6, 1998, Ernest Ojeda, individually and as Chairman of the Board of Pan American Bank, executed and delivered to the Goldbergs a Hypothecation Agreement purporting to pledge 160,000 shares of common stock of the Bank as security for the 1998 Note. (R. 38). Ernest Ojeda did not own 160,000 shares of the Bank's stock at that time or at any time. Instead, Ernest Ojeda owned shares of Pan American Bancshares, Inc. ("PAB"), a

3

holding company whose sole asset was 100% of the shares of the Bank's stock. (R. 113 at 4, fn 3).

After entering into the loan, the Ojedas began making monthly interest-only payments to the Goldbergs. The initial purpose of the loan was for it to be a short-term "bridge" loan. (R. 113 at 5) As a result, the 1998 Note matured on October 6, 1998. (R. 113 at 5). However, that maturity date was subsequently orally extended to January 6, 2000. (R. 25).

Some time after January 6, 2000, the Ojedas executed and delivered to the Goldbergs a new Collateral Note (the "2000 Note"), which extended the date for repayment of the $600,000 loan to not later than December 1, 2000. (R. 113 at 5). The 2000 Note continued to pledge and grant a security interest to the Goldbergs in the 160,000 shares of PAB stock. (R. 113 at 5).

In or about November or December 2001, Gail (who became the sole lender) and the Ojedas finalized and executed another written extension in the form of a new Secured Promissory Note (the "2001 Note"). (R. 37). The 2001 Note had a maturity date of January 2, 2003. No written agreements were entered into with respect to the $600,000 loan after the 2001 Note. From the execution of the initial 1998 Note until the Ojedas eventually defaulted in 2006, the Ojedas regularly made their scheduled interest payments to the Goldbergs. (R. 113 at 12).

### The Ojedas Fraudulent Conduct Involving the Bank

Despite the Goldbergs' security interest in PAB and, indirectly, the Bank, the Ojedas never disclosed to the Goldbergs that, effective October 2, 1998 (and pursuant to a Stipulation and Consent to the Issuance of an Order to Cease and Desist dated September 18, 1998 between the Bank, the Federal Deposit Insurance Corporation and the Office of Banks and Real Estate) an Order to Cease and Desist ("Order") was entered prohibiting the Bank, *inter alia*, from engaging

4

in specified unsafe and unsound banking practices, requiring the Bank to achieve certain capital ratios, and requiring the Bank to write-off various assets classified as a "Loss." (R. 56).

Some time in 1998 or the first half of 1999, PAB, in response to the demands of the Bank's regulators, began looking for a purchaser for the Bank. (R. 113 at 5). On or about October 4, 1999, PAB entered into a Purchase Agreement with JD Financial Group, Inc. ("JD Financial Group"), pursuant to which PAB agreed to sell its entire interest in the Bank to JD Financial Group for the purchase price of Eight Hundred Thousand Dollars ($800,000). (R. 50). In a Second Addendum to that Purchase Agreement, dated October 31, 1999, the purchase price was reduced to $250,000, plus 4,000 shares of common stock of JD Financial Group. The 4,000 shares were later sold back to J.D. Financial Group for $20,000, the proceeds of which went to preferred shareholders of PAB. (R. 50). Pursuant to the Purchase Agreement, PAB was required to change its name, to avoid any appearance that PAB retained any interest in the Bank. After the sale was closed, PAB changed its name to Cermak Road Holdings, Inc. ("Cermak"). (Transcript of Proceedings, February 25, 2008, R123, at 99; R. 113 at 6).

Ernest Ojeda, as Chairman of PAB, sent a letter dated November 17, 1999 to the shareholders of PAB. (R. 50). However, the Ojedas did not send a copy of that November 17, 1999 letter to the Goldbergs. (R. 113 at 6). In that letter, Ernest Ojeda informed the shareholders of the sale of the Bank's stock and that the company had effectuated a one-for-one hundred reverse stock split of the common stock of the company. (Transcript of Proceedings, February 25, 2008, R.123 at 95; R. 50). In addition, Ernest Ojeda stated in the letter that no new certificates representing the reduced number of shares would be distributed (R. 50, R. 113 at 7). As a result of Ernest Ojeda's decision not to issue new certificates, despite the reverse stock split of the PAB stock and the corporation's name change, Ernest Ojeda did not have to retrieve the

5

Certificate in the possession of the Goldbergs. (R. 113 at 7). Ernest Ojeda admitted that he never informed the Goldbergs of the reverse stock split or the name change to Cermak Road Holdings. (R. 113 at 7, 9). Moreover, Ernest Ojeda testified that he never advised the Goldbergs to exchange their Certificate for one from Cermak Road Holdings (R. 113 at 7).

After the sale to JD Financial Group, the $250,000 purchase price was distributed to PAB's preferred shareholders. (R. 113 at 7)  As a result, Ernest Ojeda, who owned only common stock of PAB, did not receive any funds pursuant to that distribution. (R. 113 at 7).  By the end of 1999, at the latest, the Ojedas knew that Ernest Ojeda's interest in PAB, which had been valued at $800,000 in the personal financial statement submitted to the Goldbergs in April of 1998, was worthless or practically worthless. (R. 113 at 31). Yet, they did not inform the Goldbergs of this fact at any time after the 1998 Note matured on October 6, 1998, or prior to entering into the 2000 Note, in which they continued to pledge as security Ernest Ojedas' 160,000 shares of PAB stock. (R. 113 at 24). Instead, in or about November or December 2001, when the Ojedas executed and delivered the 2001 Note, they represented in paragraph 7 that payment "is secured by Borrower's pledge to Lender of 160,000 shares of Pan American Bank." (R. 37). At no time during discussions leading up to execution of the 2001 Note (and, in fact, at no time prior to 2006) did the Ojedas inform either Gail or Ronald that Pan American Bank had been sold, that Ernest Ojeda was no longer Chairman of the Board of the Bank, that the name of PAB had been changed to Cermak Road Holdings or that PAB/Cermak had effected a reverse stock split.  (R. 113 at 9 and 14).

### The Ojedas Fraudulent Conduct Involving their McDonalds Interests

During the Summer or Fall of 1999, Ronald heard a rumor that the Bank was having some operational difficulties. Ronald was unaware that the Bank was in the process of or had

been sold by PAB. (Transcript of Proceedings, February 27, 2008, R 123 at 66). After hearing of that rumor, the Goldbergs informed the Ojedas that, unless the loan was paid off, the Goldbergs would require the Ojedas to post additional security in the form of guarantees from the Ojedas' corporations, one of which owned a certain McDonald's restaurant. (R. 113 at 7-8). The Goldbergs were informed and understood that they could not take a security interest directly in the McDonalds franchised restaurants. (Transcript of Proceedings, February 27, 2008, R 123 at 67). However, the Ojedas instead agreed to provide the guarantees. (R. 113 at 8).

On or about December 28, 1999, Ronald wrote the Ojedas a letter in which he confirmed his concern about the operational condition of the Bank and his desire to obtain additional security for the loan through a pledge or guarantee of the McDonald's restaurants held by the Ojedas. (R. 25, R. 113 at 7).

Ronald was, from the very beginning of the loan, impressed by the fact that the Ojedas owned and operated McDonalds' restaurants, having visited Ernest Ojeda at one of his restaurants, and having learned from a friend who worked at McDonald's corporate office that the Ojeda restaurants were excellent producing locations. (R. 113 at 8, 27). Ernest Ojeda was aware of the importance that the Goldberg placed on the Ojedas' ownership of the McDonald's restaurants. (R. 113 at 27). Goldberg felt that adding such corporate guarantees would provide necessary additional security to the 160,000 shares of PAB stock already pledged. (R. 113 at 8). In or about November or December 2001, Dices, Inc. (the Ojedas' management company) and Pelham (which owned one McDonald's restaurant) executed and delivered to the Goldbergs the requested written corporate guarantees. (R. 40). The Goldbergs relied upon those corporate guarantees, and the Ojedas' continuing ownership of the McDonalds franchises, in agreeing to extend the time for repayment of the Ojedas' indebtedness. (R. 113 at 8, 27)

7

On January 2, 2003, the 2001 Note matured. (R. 113 at 10). However, the Ojedas continued to make prompt interest payments. (R. 113 at 10). Accordingly, based upon the facts known to them at the time, Gail elected not to demand repayment of the loan and to forbear from pursuing immediate collection of the outstanding indebtedness. (R. 113 at 10).

On or about October 1, 2004, Pellham and Dices Enterprises sold their McDonalds restaurants for a total purchase price of approximately $5.1 million (R. 113 at 10). Approximately $2.3 million of the proceeds were placed in a *Starker* trust in order to affect a like-kind transaction. (Transcript of Proceedings, February 27, 2008, R. 123 at 21). Those funds were subsequently used by Pelham to purchase a Joey Buona Pizzeria and Grille restaurant in or about January, 2005. In addition, $738,877.00 of the sale proceeds was wired to Pelham's account at Marquette Bank and $411,081.00 was wired to Dices Enterprises' (Ernest Ojeda's sole proprietorship) account at Marquette Bank. (Transcript of Proceedings, February 27, 2007, R. 123 at 22). The Ojedas used the remainder of the proceeds of the sale for the payment of taxes and certain debts. (R. 113 at 10).

The Ojedas did not pay Gail any portion of the $600,000 principal owed on the 2001 Note. Ernest Ojeda, through his sole proprietorship, Dices Enterprises, did make numerous payments to Beverly Ojeda, repaying her for loans that she had allegedly made. (Transcript of Proceedings, February 27, 2008, R. 123 at 57-58). In addition, the Ojedas' sent their accountant on vacation to a Palm Desert resort through the Marriott Vacation Club. (Transcript of Proceedings, February 25, 2008, R. 123 at 140, February 27, 2008, R. 123 at 16).

Not only did the Ojedas not pay Gail, they also did not inform the Goldbergs of either the sale of the McDonalds restaurants or Pelham's subsequent purchase of the Joey Buona Pizzeria. (R. 113 at 11, 25). While Ernest Ojeda had in the past met with Ronald at his McDonald's

8

restaurants, he never invited the Goldbergs to meet him at the Joey Buona Pizzeria. (Transcript of Proceedings, February 25, 2008, R 123 at 125) nor did he send the Goldbergs a copy of the press release that announced their purchase of the restaurant (R. 113 at 11).

Dices Enterprises did not purchase an interest in the Joey Buona Pizzeria, and it also no longer owned a McDonald's restaurant. (R. 113 at 11). After the sale of its McDonalds' franchise, Dices Enterprises ceased to be engaged in any on-going business. (R. 113 at 12). From 1998 until the time of the McDonalds sale, it was the practice of the Ojedas to make interest payments to the Goldbergs with checks from multiple corporate accounts. (R. 113 at 12, R. 44, R. 45). However, after the sale of the McDonalds restaurants and the subsequent purchase of the Joey Buona restaurant by Pelham, all checks to the Goldbergs were written only on Dices Enterprises checks. Those checks bore the McDonald's name and/or logo, the words "general account," the specific franchise number, #4444 (the franchise owned by Dices Enterprises prior to the sale), and the address of the restaurant that Dices Enterprises previously operated on Wabash Avenue in Chicago, even though Dices Enterprises no longer owned or operated that restaurant or had any right to continue to represent itself as being affiliated with McDonalds. (R. 113 at 12, R. 46). Because Dices Enterprises did not conduct any business, it obtained funds from Pelham in order for the Ojedas to continue their scheme of writing McDonald's checks to send to the Goldbergs. (Transcript of Proceedings, February 26, 2008, R 123 at 26-28). Other than Gail, the Ojedas continued to pay other creditors of Pelham with both Dices Enterprises and Pelham checks.  (Transcript of Proceedings, February 25, 2008, R. 123 at 138-140)

Commencing in or about January of 2005, Pelham's corporate checks no longer possessed the McDonald's reference. Instead, those checks began referring to "Joey Buona Pizzeria and Grille." (R. 113 at 13). After the McDonald's restaurants were sold and Joe Buona's

9

was purchased, Gail was never paid with any such checks from Pelham's account. (R. 113 at 13). After the sale of their McDonalds franchises, the Ojedas consciously and intentionally made payments to the Goldbergs only with Dices Enterprises checks bearing McDonald's information because they wanted to deceive the Goldbergs into believing that the Ojedas were still affiliated with and owned the McDonalds restaurants. (R. 113 at 13).

In fact, after the sale of the McDonald's restaurants in October 2004, the Ojedas specifically ordered new Dices Enterprises check stock that continued to refer to McDonald's store #4444, stated the address of the restaurant that was formerly owned by Dices Enterprises (even though the Ojedas or Dices Enterprises no longer had any affiliation with that address, and had changed the mailing address for the bank account to their home address) and stated the words "General Account." (Transcript of Proceedings, February 25, 2008, R. 123 at 147-152). The Ojedas' act of ordering new Dices Enterprises checks with the McDonald's information, and their payment of interest to Gail strictly with those Dices Enterprises checks and not with Pelham checks, was intentionally done to create the false impression that the Ojedas continued to own and operate the McDonald's restaurants. (R. 113 at 28). That was the very conclusion that the Goldbergs drew. (R. 113 at 29).

The Ojedas' failure to inform the Goldbergs of the sale of the McDonald's restaurants (which resulted in Pelham no longer having an interest therein), along with the deceptive conduct with respect to the use of the Dices Enterprises checks to pay the Goldbergs, was done to lull the Goldbergs, and in fact did lull the Goldbergs, into a false sense of security. Gail relied upon the Ojedas' deceptive conduct by not demanding repayment of the $600,000 principal indebtedness. (R.113 at 28). Only when the Ojedas defaulted on the 2001 Note in or about February 2006, did Ernest Ojeda, for the first time, inform Ronald that the PAB collateral was worthless and that he

had sold the McDonalds restaurants. (R. 113 at 32; Transcript of Proceedings, February 26, 2008, R 123 at 136).

**C.    Course of Proceedings/Disposition in Court Below**

On February 25 through 27, 2008 a trial was held before Judge John H. Squires. On April 22, 2008, Judge Squires issued a thirty-three page decision making the following findings:

**McDonald's Fraud:**

(1)    "The Court finds that the Ojedas' subsequent failure to inform Gail of the sale of the McDonald's restaurants in October of 2004 was materially misleading and designed to deceive Gail in order to obtain an extension of the past due date of repayment of the $600,000 principal indebtedness" (R. 113 at 25);

(2)    "The Ojedas did not inform Gail or Ronald of Pelham's purchase of Joey Buonas." (R. 113 at 11);

(3)    "The corporate guarantees of Pelham and Dices were obtained based on the understanding that they were backed by the continued successful operations of the McDonald's restaurants . . . After the sale, the corporate guarantees were no longer backed by the McDonald's restaurants ... and this fact was not disclosed to Gail until the Ojedas stopped paying interest on the loan in January of 2006" (R. 113 at 25-26);

(4)    "Failure to inform her [Gail] of the sale and their continued use of Dices Enterprises checks that contained the McDonald's information, created a false impression that the Ojedas had a continued interest in the restaurants. These actions and omission[s] on the part of the Ojedas constitute false pretenses for purposes of § 523(a)(2)(A)." (R. 113 at 26);

(5)    "The Court finds that the Ojedas' failure to inform Gail of the sale of the McDonald's restaurants, and their subsequent decision to make payments to Gail, after the sale of the McDonald's restaurants, solely with Dices Enterprises corporate checks, which contained the McDonald's name and other information relating to the McDonald's restaurant, establishes that the Ojedas intended to deceive Gail with respect to their lack of any continued ownership of the restaurants. Further, this Court finds that that after the sale of the McDonald's restaurants, the Ojedas made payments to Gail only with Dices Enterprises checks because they intended to deceive Gail into believing that they still owned the McDonald's restaurants." (R. 113 at 27);

(6)    "The Court finds that the Ojedas' failure to inform Gail of the sale of the restaurants, which resulted in Pelham, the one guarantor on the loan who owned

11

one of the restaurants, no longer having an interest therein, along with the deceptive conduct with respect to the use of the Dices Enterprises checks to pay Gail, was misleading and lulled Gail into a false sense of security which therefrom she did not demand immediate repayment of the $600,000 principal indebtedness." (R. 113 at 27-8).

(7)    "The Court finds Beverly's testimony that she did not think it was necessary to remove the franchise number and restaurant address from the Dices Enterprises check stock incredible. Beverly was an astute and experience business woman who should have known that any reference to the formally owned McDonald's restaurant on the Dices Enterprises check stock would create the false impression that Dices Enterprises continued to own and operate the restaurant." (R. 113 at 28).

(8)    "The Court finds that the continued reference to the McDonald's restaurant on the Dices Enterprises checks was an intentional, deceitful act on the part of the Ojedas fostered to create the impression that Dices Enterprises continued to own and operate the restaurant. The Ojedas payment of interest to Gail strictly with Dices Enterprises checks and not with Pelham checks demonstrates their intent to mislead Gail to believe that Dices Enterprises continued to own the McDonald's restaurant. Indeed Gail testified that she drew this very conclusion." (R. 113 at 28-9).

## Pan American Bank Fraud

(1)    "The Court finds that at no time during the discussions leading to the execution of the 2001 Note, did the Ojedas inform Gail or Ronald that Pan American Bank had been sold, that Ernest was no longer chairman of the boards of Bancshares and Pan American Bank, that the name of Bancshares had been changed to Cermak, or that there was a reverse stock split that rendered the pledged stock shares virtually worthless." (R. 113 at 24);

(2)    "The Court finds that the renewed pledge of the Bancshares stock by the Ojedas to Gail in 2001, after Pan American Bank had been sold, was a false and misleading representation. Moreover, the Ojedas' failure to inform Gal of the sale, the reverse stock split, the name change to Cermak, and the fact that those shares were worthless constituted an intentional misleading omission." (R. 113 at 25);

(3)    "The Court finds that the Ojedas' conduct in failing to disclose the diminished value of the pledged stock amounted to false pretenses and misrepresentation by omission. The Ojedas continued pledge of Ernest's 160,000 shares of Bancshares stock after Pan American Bank had been sold and the shares became 1,600 shares in Cermak constituted a false and misleading representation of a material fact. These deliberate omissions regarding the value and material change in the bankshares stock pledged as collateral constitute dishonest conduct that § 523 (a) (2) (A) is designed to address." (R. 113 at 25);

12

(4)    "The Court finds that the Ojedas knowingly intended to deceive Gail of the true status of Pan American Bank, and Ernest's stockholdings therein. The Ojedas' pledge of the Bancshares stock in the 2001 Note when they knew Ernest no longer owned 160,000 shares of that stock demonstrates an intent to deceive Gail." (R. 113 at 27).

Based on these findings, the Bankruptcy Court found the Ojedas' conduct to be fraudulent and that Goldberg's reliance was causally related to the Ojedas' conduct. However, notwithstanding, the Court's findings regarding the Ojedas' devious scheme, the Court held that such reliance was not justifiable and that the debt owed by the Ojedas to Gail is dischargeable. (R. 113 at 32).

On May 1, 2008, Gail timely filed a Notice of Appeal to the United States District Court of the Northern District of Illinois.

## **SUMMARY OF ARGUMENT**

The Seventh Circuit has observed that "preventing fraud is more important than letting defrauders start over with a clean slate." *McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir. 2000). From the Bankruptcy Court's opinion in this matter, it is obvious that the Ojedas are not honest debtors deserving of a fresh start.

The court below found that the Ojedas intended to defraud and actually defrauded the Goldbergs. In fact, Judge Squires specifically found that Gail had "demonstrated by a preponderance of the evidence that the Ojedas obtained extensions and renewals of the unpaid debt through false pretenses by omitting to disclose pertinent changes in their financial condition and the collateral for the debt." (R. 113 at 14). However, the Bankruptcy Court nevertheless denied Gail's objections to discharge based upon its finding that "Gail's inaction did not meet the justifiable reliance standard required for recovery of her claim under § 523(a)(2)(A)." *Id.*

The Bankruptcy's Court's conclusion was erroneous.  Unfortunately, the Bankruptcy Court confused the two distinct fraudulent schemes it found that the Ojedas had committed.  The first of those fraudulent schemes was that the Ojedas misrepresented and misled the Goldbergs with respect to the Ojedas' shares of Pan American Bank Stock. The court below found that the pledge of PAB shares of stock to Gail in 2001, after its sole asset (shares of Pan American Bank) had been sold, was a false and misleading representation.  (R. 113 at 24).  The lower court also found that the Ojedas' failure to inform Gail of the sale of the Bank, the reverse stock split of PAB, the name change of that holding company and, most importantly, that the pledged shares were worthless "constituted an intentional misleading omissions" and "amounted to false pretenses and misrepresentation by omission."  (R. 113 at 24-25).  The Bankruptcy Court, however, found that any reliance by Gail was not reasonable because "Ronald's awareness of Pan American Bank's [financial] problems was a red flag that should have invited more inquiry by him." (R. 113 at 31).

The second of the fraudulent schemes was that the Ojedas intentionally failed to disclose their sale of the McDonalds restaurants to Gail, and then intentionally and fraudulently covered up their deceit through manipulative and devious means.  The Bankruptcy Court expressly found that the Ojedas failure to inform Gail of the sale of their McDonalds stores, together with their use of checks which falsely reflected their continuing involvement with McDonalds, "created a false impression that the Ojedas had a continued interest in the restaurants" and constituted "false pretenses for purposes of § 523(a)(2)(A).  (R. 113 at 26).  The court also found that "the continued reference to the McDonald's restaurants on the Dices Enterprises checks was an intentional, deceitful act on the part of the Ojedas fostered to create the impression that Dices Enterprises continued to own and operate the restaurant."  (R. 113 at 28)

14

The Bankruptcy Court found that the Ojedas conducted was intended to and did mislead Gail. (R. 113 at 28-29). Nevertheless, the Bankruptcy Court held that Gail's reliance was unjustified. However, the court provided absolutely no rationale for holding that Gail's reliance on the Ojedas' deceptive conduct with respect to the sale of the McDonalds stores was unjustified. In fact, the "red flag" which the Bankruptcy Court found required additional investigation related to the year 2001, when Gail entered into the final, two year Note with the Ojedas. However, the sale of the McDonalds stores did not occur until in or about October of 2004! Accordingly, even if Gail had conducted an additional investigation prior to the time the Note was renewed and the corporate guarantees were obtained (such as requesting updated financial information for the McDonalds stores), she would not have discovered the Ojedas' subsequent fraudulent conduct.

Instead, as the Bankruptcy Court found, that fraud occurred when the Ojedas failed to inform the Goldbergs of the sale of the McDonalds restaurants in 2004, accompanied by the Ojedas' deceptive conduct of continuing to exclusively make payments to Gail using checks which falsely and intentionally implied that the Ojedas continued to own the McDonalds stores. The Bankruptcy Court did not find any facts which would have rendered unjustified Gail's acknowledged and intentionally induced reliance upon the Ojedas' false pretenses regarding their continued ownership of the McDonalds. In fact, having continued to receive checks reflecting the McDonalds store information, and having not been advised of the sale of those stores or the Ojedas subsequent purchase of their new, riskier, restaurant venture, there was absolutely no reason why Gail would have or should have suspected that the Ojedas had made such a radical business change.

Gail's reliance was particularly reasonable given the fact that the Ojedas had a continuing duty under their personal financial statement to tell the Goldbergs of any change to their financial condition. Accordingly, Gail had every reason to expect that if there were any material change in what was represented in that document that the Ojedas would tell her about it. *John Deere v. Broholm*, 310 B.R. 864 (N.D. Ill. 2004); *First Bank of Elgin v. Niles*, 35 B.R. 409. (N.D. Ill 1983).

The Bankruptcy Court erred in holding that Gail's reliance, in particular on the fraudulent conduct with respect to the sale of the McDonalds' stores, was unjustified. Having found that Gail had proven all of the other elements required under Section 523(a)(2)(A), the Bankruptcy Court should have denied the Ojedas the benefits of the right to a discharge of their indebtedness to Gail – a right which is available only to honest debtors. Furthermore, because the Ojedas' fraudulent conduct deprived Gail of valuable collection rights which would have been available to her in 2004, when the 2001 Note was due and payment could have been demanded at any time, that exception to discharge should apply to the Ojedas' entire indebtedness to Gail.

## ARGUMENT

## I.   THE DISTRICT COURT ERRED WHEN IT FOUND THAT GAIL'S RELIANCE ON THE MCDONALDS FRAUD WAS NOT JUSTIFIABLE.

The Bankruptcy Court found that the Ojedas engaged in fraudulent conduct by failing to disclose the sale of the McDonalds restaurants, coupled with the Ojedas' complex scheme to hide the fact of that sale and intentionally mislead and deceive Gail into believing they retained an ownership interest in the McDonalds stores. Nevertheless, the court below allowed the Ojedas to escape the consequences of their fraudulent conduct by finding that Gail's undisputed reliance upon that deceptive conduct was not justifiable. The Bankruptcy Court's conclusion

that Gail's reliance was not justifiable was clearly erroneous and was contrary to settled law regarding the obligations of a deceived creditor under the justifiable reliance standard.

It is well-settled that "justifiable reliance is a lower burden to prove than reasonable reliance and does not mean that [the objecting creditor's] conduct must conform to the standard of the reasonable man." *Sterna v. Paneras*, 195 B.R. 395, 406 (N.D. Ill. 1996); See also *Bombardier v. Dobek (In re: Dobek)*, 287 B.R. 496, 508 (N.D. Ill. 2002). The law is clear that a person is justified in relying upon a misrepresentation of fact even though they could have ascertained that fact had they conducted an investigation. *Field v. Mans*, 516 U.S. 59 (1995). Thus, a debtor who has made intentional misrepresentations cannot offer as a defense the creditor's failure to investigate and verify the facts. *Id.*

The Bankruptcy Court expressly recognized that "the justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent." (R. 113 at 23, citing *Field v. Mans,* 516 U.S. 59, 70-72 (1995). In *Dobek,* cited by the Bankruptcy Court, the court stated that the inquiry under the justifiable reliance standard is whether a "cursory glance" would reveal the true circumstances. In that case, the debtor purchased a motorcycle using her good credit for her boyfriend with bad credit and never intended to use the motorcycle or to pay for it. The court held that because the lender "did not blindly ignore obvious misrepresentations because by virtue of Debtor's execution of the contract, a 'cursory glance' could not have revealed the actual facts and circumstances of the transaction." *Id.* at 509. Despite recognizing these settled principles, the Bankruptcy Court confused the facts of the various fraudulent schemes committed by the Ojedas, and appeared to impose affirmative duties upon Gail to investigate the Ojedas' deceptive concealment of their sale of the McDonalds stores. The court's opinion below was thus clearly erroneous.

The Bankruptcy Court found that the Goldbergs, having become aware of the Bank's operational and financial difficulties, should have made further inquiry in December of 1999. (R. 113 at 30).  The court further held that the Goldbergs failure to request or obtain further financial information from the Ojedas at that time (or prior to entering into the 2001 Note) despite the "red flag" regarding the Bank's problems, was simply "too ostrich-like to constitute justifiable reliance."  (R. 113 at 31). However, that alleged lack of diligence had nothing to do with the Ojedas' fraudulent conduct in concealing the sale of their McDonalds stores in October of 2004!  Had the Goldbergs requested an updated financial statement from the Ojedas in 1999 (as the Bankruptcy Court suggested), they would not have learned that the Ojedas would sell their McDonalds restaurants in 2004.  Indeed, at the time of the renewal of the Note in 2001, and even on January 2, 2003 (when the 2001 Note matured and became a demand note), an investigation by Gail would have revealed that the Ojedas still owned their McDonalds stores. Accordingly, the allegedly unjustifiable conduct of the Goldbergs in 1999 and 2001, in the light of the partially known financial problems at the Bank, does not in any way warrant the conclusion that Gail's belief that the Ojedas continued to own an interest in the McDonalds stores after October of 2004 (a belief that was intentionally fostered by the Ojedas' deceptive conduct) was unjustified.  In fact, Gail had no reason to believe that the Ojedas had sold their restaurants.

Moreover, the Bankruptcy Court was clearly wrong when it stated that Gail's "sole reliance" was upon her continued receipt of interest payments from the Ojedas.  (R 113, p. 32). Instead, the Ojedas intentionally failed to inform Gail that they had sold their McDonalds restaurants, despite the fact that their personal financial statement from 1998 (which showed their ownership of the McDonalds restaurants) promised to inform the Goldbergs if there was

any material change in their financial condition. *John Deere v. Broholm*, 310 B.R. 864 (N.D. Ill. 2004); *First Bank of Elgin v. Niles*, 35 B.R. 409. (N.D. Ill 1983). The Ojedas then actively and fraudulently covered up their omission by sending the Goldbergs monthly payments using checks bearing the McDonald's name and/or logo, the words "general account," the specific franchise number, #4444, and the address of the restaurant that Dices Enterprises operated on Wabash Avenue in Chicago, even though they were no longer affiliated with McDonalds.

Significantly, Gail was the only creditor whom the Ojedas paid exclusively using the Dices Enterprises/McDonalds checks, which were specially ordered by the Ojedas containing information falsely implying their continued affiliation with McDonalds, and not also with the Pelham/Joey Buona checks. The Ojedas never invited the Goldbergs to their new restaurant, or sent them a copy of the press release prepared by Joey Buona relating to their purchase of the restaurant.

Accordingly, it was perfectly reasonable for Gail to believe that if the Ojedas had sold their interest in the McDonalds corporation, they would have (i) told her, and (ii) stopped representing themselves as still being affiliated with McDonalds. Thus, Gail was clearly justified in believing that the Ojedas continued to own the McDonalds stores.

The Bankruptcy Court did not identify a single fact which would have put Gail on notice, from a cursory glance, that the Ojedas had sold their McDonalds restaurants in October of 2004, and then deceptively hid that fact from Gail. Instead, the court merely found that "Gail's failure to request an updated financial statement from the Ojedas and the corporate guarantors points to a lack of justifiable reliance." (R. 113 at 32). However, Gail had no legal obligation to conduct an investigation to determine whether the Ojedas continued to own the McDonald's restaurants or whether the corporate McDonalds' checks that she was receiving were really coming from a

McDonalds.[1]   As a result, the Bankruptcy Court's ruling was contrary to the settled case law

regarding justifiable reliance.  *See Field v. Mans*, 516 U.S. 59 (1995).

In *Field,* the United States Supreme Court held that § 523 (a) (2) (A) requires justifiable, not

reasonable reliance. 516 U.S. at 74-5. In that case the plaintiffs sold real estate to the debtor. The

purchase price was secured by a second mortgage on the property. The mortgage deed contained

a due on sale clause which required the debtor to obtain plaintiffs' consent to transfer the

property and if a transfer occurred without their consent, the full amount of the debt would be

due and payable upon the plaintiffs' demand. *Id.* at 61-2.  The debtor triggered the application of

the due on sale clause by conveying the property without the plaintiff's knowledge or consent.

On remand, the bankruptcy court after reviewing the facts held the following:

> Debtor suggests that by reason of Plaintiffs' visits to the site, knowledge of a new
> "substantial investor," and ultimately their knowledge that Mr. DeFelice [the
> transferee] was on the property and asserting his ownership over the property,
> Plaintiffs were sufficiently on notice of a transfer such that people of their
> individual background and knowledge should have investigated further. To the
> contrary, this Court is satisfied that these Plaintiffs have sustained their burden
> consistent with the subjective standard of justifiable reliance described in the
> Supreme Court's opinion in this case and that Debtor has not presented sufficient
> rebuttal evidence. Debtor's representations in the October 9, 1987 letter, which
> specifically stated that Debtor wished to avoid the due on sale clause and could
> accomplish his goals without a transfer of the property, coupled with the fact that
> payments under the note were kept current for more than three years after the
> transfer, satisfy this Court that the facts support Plaintiffs' representations that
> they had no reason to believe and did not believe that Debtor had in fact
> transferred the property. This Court finds that these Plaintiffs justifiably relied on
> Debtor's representations and no further investigation by them was warranted or
> required. The debt owed by Debtor to Plaintiffs is, therefore, nondischargeable.

---

[1]      The two cases cited by the Bankruptcy Court relating to the concept that a plaintiff may not "bury his head
in the sand and ignore obvious falsehoods." are completely distinguishable. The plaintiff in *Johnston v. Campbell
(In re: Campbell)*, 372 B.R. 886 (C.D. Ill 2007), blindly relied upon the debtor's ambiguous "ball park" description
of boundary lines without even a cursory examination of the surveyor stakes or survey plat. Moreover, in *Mercantile
Bank v. Canovas*, 237 B.R. 423, 429 (N.D. Ill 1998), the court held that the creditor's reliance on the debtor's
intention and ability to pay was not justifiable after the first month when the debtor ran up over $10,000 in credit
card charges during that month because it was obvious from a cursory examination that he was misrepresenting his
intention and ability to pay. Unlike the plaintiffs in these two cases, Gail had no reason to believe that the
McDonalds stores had been sold, and relied on checks which intentionally and falsely implied that the Ojedas
retained continuing ownership of the McDonalds restaurants.

*Field v. Mans, (In re: Mans)*, 200 B.R. 293, 295 (D. N.H. 1996). Accordingly, the court held that the plaintiffs' reliance was justifiable, even though they could have learned about the transfer had they conducted an investigation. *Id.* Here too, the McDonald's corporate checks delivered to Gail every month by the Ojedas sent the same message to her as did the debtors' letter in *Field*— continued ownership, upon which Gail justifiable relied upon.

Similarly, in *Memorial Hosp. v. Sarama*, 192 B.R. 922, 927 (N.D. Ill. 1996), the court found that the justifiable reliance element was satisfied where the "debtor purposefully created a contrived and misleading understanding concerning the Polyclinic payments [payments supposed to be paid by Polyclinic to Memorial Hospital for the services of medical residents, but which were really pocketed by the debtor] and intentionally deceived Memorial regarding the compensation actually paid by Polyclinic intended by it to be paid to Memorial. When considered collectively, the Debtor's actions created a false and misleading set of circumstances which constitute false pretenses as to Memorial." *Memorial Hosp. v. Sarama*, 192 B.R. 922, 927 (N.D. Ill. 1996).

Even the case cited by the Bankruptcy Court, *Taylor v. Sykes*, 2005 U.S. Dist. LEXIS 34904 (N.D. Ill. 2005), supports the conclusion that Gail's reliance was reasonable because she was not required to conduct an investigation to verify whether the McDonalds checks that she was receiving were really coming from McDonalds. In *Taylor*, the creditor, who was faced with foreclosure, sold her home to the debtor. The debtor misrepresented the amount of proceeds which would be received from that sale. The District Court found that the bankruptcy court erred in finding that, due to lack of justifiable reliance, the note was dischargeable. Instead, the District Court found that the creditor could have justifiably believed that the loan proceeds would

21

be used to pay off the mortgage. Moreover, the *Taylor* opinion also stated that "justifiable reliance does not require a creditor to conduct her own investigation. Inasmuch as a creditor need not conduct a title search to rely justifiably on a debtor's representations . . . the law did not require Taylor [the creditor] to contact her mortgage company to verify the amount of equity Sykes [the debtor] said that she had in her home." Similarly, Gail justifiably believed that the checks that she was receiving were in fact McDonalds checks and was not required to do additional research to find out if in fact the Ojedas still owned the McDonalds stores.

The conclusions in *Field, Taylor,* and *Sarama* are equally applicable in the present case. The court below found that the McDonald's information on the checks sent to Gail created a false and misleading set of circumstances upon which Gail actually relied upon (R. 113 at 28-29). The court below found that "the Ojedas' payment of interest to Gail strictly with Dices Enterprises checks and not with Pelham checks demonstrates their intent to mislead Gail to believe that Dices Enterprises continued to own the McDonald's restaurant . . . indeed Gail testified that she drew this very conclusion." (R. 113 at 29).

The reasonableness of Gail's reliance is confirmed by the complexity of the Ojedas' scheme to deceive her. That the Ojedas needed to go so far as to order new checks which continued to contain information relating to their former McDonalds restaurants (after they had sold their interest in that restaurant), and then have Pelham fund the inactive Dices corporation to allow it to continue to write checks, primarily to the Goldbergs, containing the false and misleading McDonalds information, underscores the extent to which Gail's reliance was justifiable. Significantly, other creditors (who were not relying upon the Ojedas' continuing ownership of the McDonalds restaurants) were paid out of both Dices and Pelham—Gail was the only creditor who exclusively received what appeared to be McDonalds affiliated checks

22

from Dices after the sale of the McDonalds in October 2004. (Transcript of Proceedings, February 25, 2008, R. 123 at 138-140). Clearly, the Ojedas did not want Gail to know that they had sold their McDonalds restaurants, precisely because they knew the importance which the Goldbergs placed upon their involvement with that venerable franchise.

Thus, the Bankruptcy Court's ruling that Gail did not justifiably rely upon the Ojedas' deceptive conduct, which was intended to and did mislead her into believing that the Ojedas continued to own the McDonalds restaurants, was clearly erroneous. In light of the foregoing, Gail requests that this Court reverse the Bankruptcy Court's ruling and find that her reliance was justifiable as to the McDonald's Fraud.

## II.   THE DISTRICT COURT ERRED WHEN IT FOUND THAT GAIL'S RELIANCE ON THE PAN AMERICAN BANK FRAUD WAS NOT JUSTIFIABLE.

The Bankruptcy Court also erred in finding that the Gail's reliance upon the Ojedas' fraudulent conduct with the Bank stock was unjustified. The court below reasoned that Gail Goldberg's actual reliance on the Pan American Bank fraud was not justifiable because "Ronald was aware in December 1999 that the Bancshares stock was not worth the $800,000 he had originally thought it was worth. Ronald did seek the additional corporate guarantees from Dices, Inc. and Pelham, but after that, he did not request or obtain any further updated financial information. Ronald's awareness of Pan American Bank's problems was a red flag that should have invited more inquiry by him. Instead he blindly relied upon the Ojedas' continued payment of interest." (R. 113 at 31).

The Bankruptcy Court's conclusion is clearly erroneous. Ronald and Gail did not blindly rely upon the Ojedas' continued payment of interest. Rather, when Ronald learned of possible financial difficulties relating to the bank, he took affirmative measures and immediately contacted Ernest Ojeda to inquire as to the circumstances and wrote him a letter asking for a

23

UCC filing for the bank stock and seeking a guaranty. (R. 113 at 7-8). Ronald knew that the Pelham McDonald's restaurant was an excellent producing location and "would provide necessary additional security to the 160,000 shares of Bancshares stock that the Ojedas had previously pledged." (R. 113 at 7-8). In light of the circumstances, he asked for the guaranty that he wanted **and he got it!** (R. 113 at 7-8).

Accordingly, the Goldbergs did not simply rely on the receipt of the Ojedas' payments. They relied on the fact that upon the renewal, Gail would obtain the guaranty of an excellent McDonalds restaurant. Normally, when people get what they want, they do not conduct further investigation into the facts.

Nor were the Goldbergs legally obligated to conduct any investigation. *Field v. Mans*, 516 U.S. 59 (1995) (holding that in 523 (a) cases creditors are justified in relying upon a misrepresentation of fact even though they could have ascertained that fact had they conducted an investigation). The Ojedas--debtors who have made intentional misrepresentations--cannot offer as a defense the Gail Goldberg's failure to fully investigate and verify the facts. *Id.*

Moreover, the Bankruptcy Court's opinion overlooks the fact that the personal financial statement provided by the Ojedas contained a provision expressly warranting that the information provided was to be deemed "continuing to be true and correct until a written notice of a change is given to you," which created an affirmative duty upon the Ojedas to inform the Goldbergs in writing as to any material changes to their financial condition. (R. 41) *See First Bank of Elgin v. Niles*, 35 B.R. 409, 410-11 (N.D. Ill 1983). In *Niles*, the debtor borrowed a large sum of money from the bank. The debtor was told that he would have to bring in his most current financial statement before the bank could approve the loan. The debtor provided a financial statement that, like the statement provided by Ojedas, contained language stating "that

you may consider this statement as continuing to be true and correct until a written notice of a change is given to you by the undersigned." The debtor dated the financial statement as of January of a particular year, but gave it to the lender about a month later. In between, there was a material change in the financial condition reflected in the backdated financial statement. The Court found that the bank was justified in relying on the contents of the financial statement because of the clause making the statement "continuing" and also because the debtor was under a duty of good faith and fair dealing not to engage in activity that was designed to deceive the bank. Here too, the continuing affirmative obligation of the Ojedas to inform the Goldbergs of any material change, together with the Ojedas' agreeing to issue the corporate guaranties that Ronald Goldberg had asked for, made Gail's reliance without further additional investigation justifiable.

In light of the foregoing, Gail requests that this court also reverse the Bankruptcy Court's ruling that her reliance was not justifiable as to the Pan American Bank fraud.

### III.    THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE AMOUNT OF NON-DISCHARGEABLE DEBT IS LIMITED TO UNPAID INTEREST.

Although not relevant to its decision, the Bankruptcy Court also commented that the only indebtedness of the Ojedas which would potentially be non-dischargeable is "the unpaid interest from January 2006, plus attorneys fees and costs," not the full amount of the indebtedness due under the $600,000 loan. (R. 113 at 17). The Bankruptcy Court's dicta was based upon its erroneous belief that there was no evidence that Gail lost any valuable collection rights as a result of the Ojedas' admittedly fraudulent conduct. (Id., at 18). However, that finding is not supported by the facts and is clearly erroneous. Accordingly, because this Court needs to reverse the Bankruptcy Court's erroneous conclusion that the Ojedas' indebtedness to

Gail is dischargeable, this Court should also instruct the Bankruptcy Court that the entire indebtedness to Gail should be excepted from discharge pursuant to Section 523(a)(2)(A).

As the Bankruptcy Court observed, a non-dischargeability finding is limited to the extent of the debt attributable to the debtors' false pretenses, false representations or fraud. (R. 113 at 16). That limitation creates some difficulty when dealing with a fraudulently induced extension or renewal. However, as the Bankruptcy Court noted, a fraudulently induced forbearance may constitute an extension or renewal of credit for purposes of § 523 (a)(2) (A). (R. 113 at 18). *See Freer v. Beetler (In re: Beetler)*, 368 B.R. 720, 728 (C.D. Ill. 2007). Under those circumstances, since the debt was not initially induced by the fraudulent conduct, it has been held that "the elements of proof necessary to establish such fraudulently-induced forbearance include discernable harm to the creditor in the sense that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation and that the remedies lost value during the extension period." (R. 113 at 18, citing *Freer*, 368 B.R. at 730-1).

In this case, the Bankruptcy Court determined that "there is no proof that Gail's forbearance lost any value." (R. 113 at 18). As a result, the court concluded that, even if the exception to discharge was applicable, only the unpaid interest from January of 2006, plus attorney's fees and costs, were potentially non-dischargeable. (R. 113 at 17). The Bankruptcy Court's analysis was superficial and its conclusion was contrary to the evidence and the well-settled case law regarding fraudulently induced forbearance.

In 2004, after the sale of the McDonalds stores, Gail clearly had valuable collection remedies which she did not exercise because she believed that the Ojedas still owned the McDonalds restaurants. The evidence established that the Ojedas sold their McDonalds

restaurants for $5.1 million. The Bankruptcy Court asserted that, because the Ojedas used a portion of those proceeds to conduct a § 1031 like-kind exchange, all of the sale proceeds would have been lost to taxes had the Ojedas paid any of their creditors. (R. 113 at 18). However, the Ojedas admitted that they took approximately $1.1 million out of the sale proceeds and wired $411,000 into the Dices Enterprises account (Dices Enterprises was the sole proprietorship of Ernest Ojeda) and $738,000 into the Pelham corporate account. (Transcript of Proceedings, February 27, 2007, R. 123 at 22-26). It was undisputed that the Ojedas used that portion of the sale proceeds to pay other creditors, including Beverly Ojeda! (Transcript of Proceedings, February 27, 2008, R. 123 at 57-58). The Ojedas even sent their accountant on a paid vacation. (Transcript of Proceedings, February 25, 2008, R. 123 at 140, February 27, 2008, R. 123 at 16).

Accordingly, at the time of the sale of the McDonalds restaurants, the Ojedas had ample funds with which to repay the Goldbergs. Instead, the Ojedas elected to continue to deceive the Goldbergs and to use the funds available to them to finance an entirely different restaurant venture, without Gail's knowledge or consent.

Under applicable case law, it is clear that Gail had valuable collection rights which she lost as a result of the Ojedas' fraudulent conduct hiding the fact that they had sold their McDonalds restaurants in October of 2004. For example, in *Freer v. Beetler*, the debtors ran a retail business selling farm equipment. The debtor agreed to sell the creditor's tractor on consignment for a commission. The debtor sold the tractor, but used the proceeds to pay other creditors. Whenever the creditor inquired about the tractor, the debtor husband lied and told her that it had not been sold yet. The creditor did not learn about the fictitious sale until the debtor experienced severe financial trouble. As in the present case, the court in *Freer* found that "had

27

she known the truth earlier, she would have sued earlier. Her reliance was entirely justifiable." *Freer*, 368 B.R. at 731.

In holding that the creditor lost valuable collection rights, thus warranting a non-discharge finding, the court in *Freer* found that "it is enough of a showing that, when the fraud occurred, the economic circumstances would have allowed recovery of the debt. *Id.* at 732. Because it can be difficult to know for sure what would have happened absent the debtor's fraudulent conduct, the court specifically held that "[i]nferential proof is to be expected and is sufficient." *Id.* at 731. In finding that the inferential proof was sufficient to support the exception to discharge, the Court in *Freer* relied upon the fact that (1) the debtor "was still at the front end of its slide into insolvency…It's financial troubles became severe only later," (2) there was a "substantial" lapse of time between the fraudulent conduct and the debtor's demise (13 months until it closed its doors, and 20 months until it sought bankruptcy protection); (3) the debtor continued to operate its business and pay its debts for over a year after the fraud occurred; and (4) the fraud "did not occur at a time when the debtors were hopelessly insolvent and on the verge of bankruptcy." *Id.* at 732. Accordingly the court concluded that "it is more likely than not that Mrs. Freer would have collected her debt if she had learned of the sale when it occurred or within a few months thereafter." *Id.*

Similarly, in *Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998), the creditors held a second mortgage on real estate securing a corporate note personally guaranteed by the debtor. In violation of the mortgage, the debtor sold the real estate without the knowledge or consent of the creditors. The First Circuit reasoned that by misleading the creditors into believing no sale had occurred, the debtor prevented them from exercising their acceleration rights. Although the creditor argued that it was uncertain whether the debtor would have exercised those rights, the

First Circuit held that it "does not lie in Man's mouth, having cheated the Fields of their opportunity to have decided in October of 1987 whether or not to exercise their acceleration right, to argue that they must now bear the difficult burden of demonstrating beyond question that they would, in fact, have accelerated the loan." *Id.* at 44-45. Thus, as in *Freer*, the court concluded that it is sufficient to show that, when the fraud occurred, "the economic circumstances would have allowed the Fields to have successfully recovered their loan had they wished to do so." *Id.* at 45.

Gail clearly satisfied that test in the case at bar. As in *Freer*, Ernest Ojeda testified that in October 2004 he did not consider filing for bankruptcy and that he was able to pay his debts. (Transcript of Proceedings, February 27, 2008, R.123 at 15). Unlike in *Freer*, not only were the Ojedas not beginning a slide into insolvency in October of 2004, but they were flush with money after having sold their profitable McDonalds restaurants. Not only were various creditors, including Beverly Ojeda, paid out of the proceeds of that sale, but the Ojedas even generously sent their accountant on a vacation using those proceeds. It is thus incorrect to say that Gail had no possibility of collecting the Ojedas' debt in 2004, had she been told that the McDonalds stores had been sold and demanded repayment.

Indeed, the Bankruptcy Court completely ignored the fact that, at or about the end of 2004, the Ojedas had purchased, in an arms-length transaction, the Joey Buona Pizzeria restaurant in which they had $1,050,000 in equity, pursuant to their initial cash payment. (R. 31). That asset was thus also available for Gail to pursue collection remedies against. Indeed, it is reasonable to assume that the Ojedas would not have allowed their new restaurant venture to go under at the very time it had been purchased, and would have found a way to pay off their debt to Gail. It was not until approximately a year later that the Ojedas had run their new

29

venture into the ground, leaving Gail with no collection remedies.

Clearly, at the time of the Ojedas' fraud, Gail could have exercised collection remedies and demanded immediate repayment had she known about the sale and accelerated the balance owed. Instead, the Ojedas put into motion their scheme to cover up their deceit by sending the Goldbergs monthly payments using checks bearing the McDonalds information even though they were no longer affiliated with McDonalds. By 2006, when the Ojedas finally informed the Goldbergs of their financial situation, Gail's collection remedies were worthless.

Accordingly, the Bankruptcy court erred when it found that that Gail suffered no discernable harm or that she did not have valuable collection remedies at the time of the fraudulent conduct. Accordingly, on remand, the Bankruptcy Court should be instructed to except the entire amount claimed by Gail Goldberg from discharge, and not just the interest that accrued on that debt after the Ojedas' fraudulent conduct.

## CONCLUSION

For the foregoing reasons, Gail Goldberg respectfully requests that this Court: (1) reverse the Bankruptcy Court's decision finding that the debt owed by the Ojedas to Gail Goldberg is dischargeable; (2) enter an order finding that the debt owed by Defendants/Appellees to Plaintiff/Appellant in the amount of $600,000 principal, plus interest, attorney fees, costs is non-dischargeable and excepted from discharge by 11 U.S.C. § 523 (a) (2) (A); and (3)  enter an order for such other and further relief as this Court deems just and appropriate.

Joseph L. Matz (1797093)  
Stuart Gimbel (6194321)  
Alon Stein (6278515)  
KAMENSKY RUBINSTEIN  
HOCHMAN & DELOTT, LLP  
7250 N. Cicero Avenue, Ste. 200  
Lincolnwood, Illinois  60712  
(847) 982-1776

Respectfully submitted,

**GAIL GOLDBERG**

s/s <u>Alon Stein</u>  
One of her attorneys

IN THE UNITED STATES DISTRCT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GAIL GOLDBERG,                          )
        Plaintiff-Appellant         )        Judge Joan B. Gottschall
                                    )        Case No. :  08 C 2808
    v.                                  )
ERNEST J. OJEDA,                        )
BEVERLY V. OJEDA,                       )
        Defendants-Appellees        )

## TABLE OF CONTENTS TO APPENDIX

**MEMORANDUM OPINION** ....................................................................................................A1

**NOTICE OF APPEAL** ............................................................................................................A34

**ORDER (April 22, 2008)** .........................................................................................................A38

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: | )   Bankruptcy No. 07 B 00022 |
| | )   Chapter 7 |
| ERNEST J. OJEDA and | )   Judge John H. Squires |
| BEVERLY V. OJEDA, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| GAIL GOLDBERG, | ) |
| | )   Adversary No. 07 A 00192 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERNEST J. OJEDA and | ) |
| BEVERLY V. OJEDA, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Gail Goldberg ("Gail") against Ernest J. Ojeda ("Ernest") and Beverly V. Ojeda ("Beverly") (collectively the "Ojedas") which seeks to except a debt owed by the Ojedas from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). For the reasons set forth herein, the Court finds that the debt owed by the Ojedas to Gail is dischargeable. The Court finds that at trial Gail demonstrated by a preponderance of the evidence that the Ojedas obtained extensions and renewals of the unpaid debt through false pretenses by omitting to disclose pertinent changes and developments in their financial condition and the collateral for the debt, but that Gail's inaction did not meet the justifiable reliance standard required for recovery of her claim under § 523(a)(2)(A).

-2-

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

## II. FACTS AND BACKGROUND

Many of the facts are not disputed. The Ojedas, restauranteurs, met Gail, a former high school teacher, and her husband, Ronald Goldberg ("Ronald"), an entrepreneur and lender engaged in the wireless phone business, prior to August of 1998 through George Tomaszewicz, a loan broker who was a neighbor of Gail and Ronald. The purpose of the meeting was for the Ojedas to obtain a $600,000 loan from Gail and Ronald. The contemplated loan was to be a short-term bridge loan used to pay off a previous loan owed by Ernest for $600,000 from Richmond Bank. (Gail Ex. U.) Prior to Gail and Ronald agreeing to loan funds to the Ojedas, the Ojedas represented to Gail and Ronald that they were going to provide, as collateral, bank stock in Pan American Bank, which was owned by Pan American Bancshares, Inc., a Delaware corporation ("Bancshares"). Bancshares was the holding company that owned all of the outstanding shares of Pan American Bank, an Illinois banking corporation.

Ernest represented that he was the chairman of the boards of directors of Pan American Bank and Bancshares. The Ojedas provided Ronald and Gail with a personal financial statement, dated April 3, 1998, which stated that Ernest owned 160,000 shares of

-3-

Pan American Bank stock with a value of $800,000. (Gail Ex. F.) The financial statement

stated in pertinent part as follows:

> Each undersigned understands that you are relying on the
> information provided herein (including the designation made
> as to ownership of property) in deciding to grant or continue
> credit. Each undersigned represents and warrants that the
> information provided is true and complete and that *you may*
> *consider this statement as continuing to be true and correct*
> *until a written notice of a change is given to you by the*
> *undersigned.* You are authorized to make all inquiries you
> deem necessary to verify the accuracy of the statements made
> herein. . . .

(*Id.*) (emphasis supplied).

The Ojedas also informed Gail and Ronald that they were the sole shareholders of

two Illinois corporations, Dices, Inc.[1] and Pelham Enterprises, Incorporated ("Pelham").

Pelham owned franchise rights, a real estate lease, and related personal property with respect

to a McDonald's restaurant located at 1951 North Western Avenue, Chicago, Illinois. The

Ojedas, doing business as Dices Enterprises,[2] owned franchise rights, a real estate lease, and

related personal property with respect to a McDonald's restaurant located at 405 North

Wabash Avenue, Chicago, Illinois. Ernest and Beverly were actively involved in the

management and operations of both restaurant facilities. The Ojedas provided Gail and

Ronald with financial statements for Pelham and Dices Enterprises. (Gail Exs. H & I.)

Further, the Ojedas provided Gail and Ronald with their income tax return for 1997 (Gail Ex.

---

[1] Dices, Inc. operated as a management company and did not own any substantial
assets.

[2] The Ojedas operated Dices Enterprises as a proprietorship.

J), press releases and articles describing Pan American Bank and Ernest's role there (Gail Ex. G), and draft financial statements for Pan American Bank. (Gail Ex. O.)

On August 6, 1998, Gail and Ronald loaned $600,000 to the Ojedas at an annual interest rate of 18%. (Gail Ex. A.) The loan was intended to be short-term and was evidenced by a secured promissory note (the "1998 Note") dated August 6, 1998. (*Id.*) The terms of the 1998 Note required a payment of accrued interest on September 6, 1998, and on the maturity date of October 6, 1998, the principal amount and any accrued unpaid interest remaining was to be repaid. (*Id.*) Pursuant to the 1998 Note, the loan was secured by 160,000 shares of "Pan American Bank" stock.[3] (*Id.*)

In addition, on August 6, 1998, Ernest, individually and as chairman of the board of Pan American Bank, executed and delivered to Ronald and Gail a hypothecation agreement that described the "Pan American Bank" stock being pledged as security for the 1998 Note. (Gail Ex. C.) At the time the 1998 Note and hypothecation agreement were tendered to Ronald and Gail, Ernest also tendered possession of an original stock certificate No. CS-001

---

[3] Ernest did not own 160,000 shares of Pan American Bank's stock at that time or any time. Rather, Ernest owned 160,000 shares of Bancshares (Gail Ex. N), the holding company whose sole asset was 100% of the shares of Pan American Bank's stock. As a result, in 1999, Ernest, individually and as chairman of Bancshares, executed and delivered to Ronald and Gail a second hypothecation agreement pledging 160,000 shares of common stock of Bancshares as security for the 1998 Note. (Gail Ex. D.) Ernest testified at trial that in his mind Pan American Bank and its holding company, Bancshares, were one in the same. Although they were separate corporate entities, Gail is not raising any issue regarding this failure to distinguish between Pan American Bank and Bancshares either in the original loan documents or the subsequent documents with respect to the extensions.

-5-

registered in his name reflecting the issuance of 160,000 shares of Bancshares stock to Ernest. (Gail Ex. N.) Ronald and Gail retained possession of the stock certificate at all relevant times and continue to retain possession of the certificate.

At some unknown point in time, the Ojedas also executed an undated UCC-1 financing statement that described the collateral as 160,000 shares of "Pan American Bancshares." (Ojeda Ex. No. 4.) Ronald and Gail did not file the UCC-1 financing statement with the Illinois Secretary of State, nor did they file notice of either the stock power or the hypothecation agreement with the Bancshares stock registrar or transfer agent.

After entering into the loan agreement, the Ojedas began making monthly interest payments to Ronald and Gail. The Ojedas were unsuccessful in their efforts to secure a conventional take-out lender. The Ojedas did not repay the principal of the 1998 Note on its October 6, 1998 maturity date. Rather, the Ojedas continued to make monthly interest payments, and Ronald and Gail continued to accept those payments. Subsequently, some time after the 1998 Note matured, the Ojedas executed an undated note payable to both Ronald and Gail, which replaced the 1998 Note and extended the maturity date of the loan until December 1, 2000 (the "Second Note"). (Ojeda Ex. No. 2.) The Second Note continued the pledge and grant of the security interest to Ronald and Gail in the 160,000 shares of Bancshares stock. (*Id.*) Thereafter, Gail and Ronald sent monthly invoices to the Ojedas for interest due on the loan. Pursuant to the Second Note, the Ojedas made all of the monthly interest payments to Gail and Ronald.

During 1998, Pan American Bank was experiencing financial difficulties and was unable to raise additional capital as demanded by the Bank's regulators. As a result, some

time in 1998 or the first half of 1999, Bancshares, in response to Pan American Bank's regulators, began to look for a purchaser for the Bank. This fact was not disclosed to Ronald and Gail.[4] Unbeknownst to Ronald and Gail, on October 5, 1999, Bancshares entered into a purchase agreement with JD Financial Group, Inc. ("JD Financial") pursuant to which Bancshares agreed to sell all of its interest in Pan American Bank to JD Financial for $800,000. (Gail Ex. P.) In a second addendum to that purchase agreement, dated October 31, 1999, the purchase price was amended to $250,000, plus 4,000 shares of common stock of JD Financial, which subsequently became the new holding company for Pan American Bank. (Id.) After the sale was closed, Bancshares changed its name to Cermak Road Holdings, Inc. ("Cermak").

Incidental to the sale, but without the knowledge of Ronald and Gail, Ernest, as chairman of the board of Bancshares, sent a letter dated November 17, 1999 to the shareholders of Bancshares. (Id.) In the letter, Ernest informed the shareholders that Bancshares had sold all of the stock of Pan American Bank to JD Financial, had effectuated a one-for-one hundred share reverse stock split of the common stock of Bancshares, and that the total number of common shares of stock had been reduced to 15,000. (Id.) Additionally, Ernest stated in the letter that no new certificates representing the reduced number of shares

---

[4] The testimony on this point was in conflict. Both Ronald and Gail testified that they were unaware of the Pan American Bank sale until after January 2006, when the Ojedas stopped paying interest on the loan. Ernest, on the other hand, testified that he informed Ronald of the sale of Pan American Bank at or around the time of the sale. Ernest's trial testimony, however, was contradicted by his deposition testimony wherein he stated that he did not remember if he told Ronald and Gail about Pan American Bank's financial problems and ultimate sale. Because of this conflict in Ernest's testimony, the Court affords more weight and credence to the testimony of Ronald and Gail.

-7-

would be distributed. (*Id.*) As a result of the decision not to issue new certificates, the stock certificate in the possession of Ronald and Gail was never retrieved or exchanged for shares in Cermak. Only the preferred shareholders of Bancshares received funds from the sale of Pan American Bank; Ernest did not receive any monies.

The Ojedas knew at that time that Ernest's interest in Bancshares, which had been valued at $800,000 in the personal financial statement submitted to Gail and Ronald in April of 1998, was not worth that amount in November 1999 when the sale of Pan American Bank to JD Financial was consummated. Ernest admitted that he never told Ronald or Gail of the reverse stock split for Bancshares or its name change to Cermak. Moreover, he testified that he never advised Ronald and Gail to exchange the Bancshares pledged stock certificate for one from Cermak.

Around the time of the Pan American Bank sale, Ernest was communicating with Ronald. On December 28, 1999, Ronald wrote Ernest a letter expressing concern over the financial condition of Pan American Bank, his desire to obtain additional collateral to secure the loan, and the fact and substance of his prior conversation with Ernest. (Ojeda Ex. No. 3.) In this letter, Ronald confirmed that the "note was extended to January 6th of 2000." (*Id.*) Ronald also acknowledged that he had knowledge of Pan American Bank's financial problems several months prior to the sale. Specifically, Ronald wrote: "[s]everal months ago . . . with the concerns of [Pan American Bank's] operational condition, my legal staff reviewed the loan documents and extensions." (*Id.*) Further, Ronald confirmed a conversation with Ernest regarding additional support for the loan. He stated: "[n]ot mentioned in the documents however discussed with you would be an additional pledge and

-8-

or guarantee of the McDonald['s] Stores as the *[Pan American] [B]ank operations and value are questionable.*" (*Id.*) (emphasis supplied).

Ronald testified that from the beginning of the loan, he was impressed by the fact that the Ojedas, through Pelham and Dices Enterprises, owned and operated the McDonald's restaurants. Ronald testified that he learned from a friend who worked at the McDonald's corporate office that the two restaurants were excellent producing locations. Ronald stated that he thought that adding corporate guarantees from Pelham and Dices Enterprises would provide necessary additional security to the 160,000 shares of Bancshares stock that the Ojedas had previously pledged.

In an undated letter that was postmarked March 6, 2000, Ronald wrote to his attorneys advising them of his belief that the value of the Bancshares stock was inadequate to secure the Ojedas' loan, and suggesting that they negotiate to obtain additional guarantees and security in connection with the negotiation of an extension of the maturity date of the loan. (Ojeda Ex. No. 4.) Ronald wrote in the letter: "[a]s we discussed we consider the stock from |Bancshares| not worth the collateral value. |Ernest| has agreed to issue a corporate guarantee from his McDonald|'s| Stores. I would further suggest if you think the guarantee is not strong or protective enough that you ask for a pledge or something of his stock in the stores." (*Id.*)

The negotiations between the Ojedas and Gail and Ronald relating to the extension of the Second Note continued for approximately eighteen months. On November 1, 2001, Gail and the Ojedas finalized and executed another written extension in the form of a new

secured promissory note (the "2001 Note") for the principal amount of $600,000.[5] (Gail Ex. B.) Both Dices, Inc. and Pelham executed the 2001 Note as guarantors. (*Id.*) On November 29, 2001, Pelham and Dices, Inc.[6] executed separate corporate guarantee agreements. (Gail Ex. F.) Pursuant to the terms of the 2001 Note, the eighteen percent interest was payable monthly, and a final payment of interest and principal was payable on the maturity date of January 2, 2003. (Gail Ex. B.) The 2001 Note was secured by the pledge of 160,000 shares of Bancshares stock[7] which was allegedly memorialized in a certain hypothecation agreement.[8] (*Id.*) At the time the Ojedas executed the 2001 Note, Ernest did not own 160,000 shares of Bancshares stock. He never advised Ronald or Gail that Bancshares was now Cermak and those shares were worthless after the Pan American Bank sale. Nothing in the 2001 Note or the guarantees restricted the Ojedas or the two corporate guarantors—Pelham and Dices, Inc.—from selling or otherwise disposing of any of their assets, with the exception of the Bancshares stock.

---

[5] At this point in time, Gail became the sole lender and payee of the 2001 Note from the Ojedas. Ronald and Gail testified that this was done for estate planning purposes.

[6] As set forth in footnote one, Dices, Inc. did not own any substantial assets. Rather, Dices Enterprises was the proprietorship, operated by the Ojedas, that owned and operated the McDonald's restaurant located on Wabash Avenue in Chicago. Nevertheless, Dices, Inc. executed the 2001 Note as guarantor and executed a corporate guarantee.

[7] The 2001 Note referenced 160,000 shares of Pan American Bank stock. As discussed previously in footnote two, however, Ernest owned 160,000 shares of Bancshares, not Pan American Bank stock.

[8] There is no evidence that any such new hypothecation agreement was executed in connection with the 2001 Note.

No further written agreements were entered into between the Ojedas and Ronald and Gail with respect to the $600,000 loan after the 2001 Note. On January 2, 2003, the maturity date of the 2001 Note, the Ojedas did not pay the principal amount of the loan. However, they continued to make prompt monthly interest payments to Gail and she continued to accept such payments. Gail elected not to demand repayment of the loan and she did not pursue immediate collection of the unpaid outstanding principal indebtedness.

In 2004, the Ojedas began to explore the sale of the McDonald's restaurants. The Ojedas testified that they considered a sale because ongoing changes in the corporate structure made the restaurants less attractive as investments. The Ojedas had a significant deferred tax gain, however, that could be realized if they sold the restaurants. Thus, the Ojedas testified that they began to look for a new "like-kind" business in which to invest the proceeds of the sale and avoid recognition of the tax gain on the sale. On October 1, 2004, Pelham and Dices Enterprises sold their interests in the two McDonald's restaurants and franchises for a total purchase price of approximately $5,100,000. (Ojeda Ex. No. 43.) The proceeds of the sale were used to pay outstanding claims of the restaurants' creditors and the Ojedas. (*Id.*) The approximate $2,300,000 balance of the sale proceeds was deposited into a "Starker trust" pending investment in like-kind assets to be qualified under I.R.C. § 1031.[9]

---

[9] Section 1031(a) of the Internal Revenue Code, in general, permits property used in a trade or business or held for investment to be exchanged solely for like-kind property which will be used in a trade or business or held for investment, without the recognition of tax. A deferred exchange allows the taxpayer to relinquish property currently held and receive like-kind replacement property in the future. The case *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979), gave rise to the deferred exchange. In 1984, Congress enacted § 1031(a)(3), which permits deferred exchanges within a specific time limitation. Placement of property into a Starker trust allows a seller to complete a non-simultaneous property exchange and postpone recognition of capital gain taxes.

-11-

The Ojedas testified that the instant loan was not repaid to Gail because on the advice of their attorneys and accountants, payment of the loan would have triggered recognition of serious tax consequences and recognition of capital gain.

During the same time they negotiated the sale of the McDonald's restaurants, the Ojedas negotiated to purchase Joey Buona's Pizzeria Grille ("Joey Buona's") located at 160-164 East Superior Street, Chicago, Illinois. On December 31, 2004, Pelham entered into an asset purchase agreement with Joey Buona's Pizzeria Grille-Chicago, L.L.C. wherein Pelham acquired a restaurant business, including an assignment of a lease and option to purchase certain real property premises, all personal property located on the premises and used in the operation of the restaurant, and certain intellectual property rights relating to the "Joey Buona's System." (Ojeda Ex. No. 46.) Pelham closed the purchase of the Joey Buona's restaurant in the middle of January of 2005. The remaining proceeds of the sale of the McDonald's restaurants were invested in the purchase of Joey Buona's. Ernest testified he told Gail in a short phone conversation about the McDonald's sales and his intent to repay the loan owed to her. Gail denied that Ernest told her about the sale of the restaurants.

On January 26, 2005, a press release was issued that announced a sale of Joey Buona's and disclosed the Ojedas as the purchasers of the restaurant. (Ojeda Ex. No. 45.) The Ojedas did not inform Gail or Ronald of Pelham's purchase of Joey Buona's. The Ojedas testified that they were on site at the Joey Buona's restaurant almost every day during the time Pelham owned and operated the restaurant. The Ojedas also testified that they did not take any action to conceal their ownership of Joey Buona's. Pelham was unsuccessful

-12-

in its operation of the Joey Buona's restaurant. Joey Buona's failed in February of 2006. Thereafter, Pelham filed a voluntary Chapter 7 bankruptcy petition on January 25, 2007.[10]

The Ojedas made all of their regularly scheduled interest payments to Gail without fail until they defaulted in January of 2006. Since the inception of the loan, the Ojedas made approximately eighty-nine monthly payments of interest with an aggregate value of approximately $801,000. The Ojedas never repaid any of the principal on the $600,000 loan. Thus, although the loan between the Ojedas and Ronald and Gail was intended to be a short-term bridge loan, it lasted for almost eight years during which time interest was paid as agreed.

Since 1998, the Ojedas made the majority of their interest payments to Gail with Pelham or Dices Enterprises checks. (*See, e.g.,* Gail Exs. K & L.) The Pelham and Dices Enterprises check stock included the McDonald's name, store numbers, store addresses, and a reference to "general account." (*Id.*) After March 2001, the check stock also contained the McDonald's logo. After the sale of the McDonald's restaurants in October of 2004, and the subsequent purchase of Joey Buona's, the Ojedas wrote checks to Gail only on Dices Enterprises check stock that had the McDonald's name and/or logo, the words "general account," the specific franchise number, and the address of the restaurant that Dices Enterprises operated on Wabash Avenue in Chicago, even though Dices Enterprises no longer owned or operated the restaurant or had any right to continue to represent itself as being affiliated with McDonald's. (*See, e.g.,* Gail Ex. L.)

---

[10] The Court issued a Memorandum Opinion that sets forth the background and circumstances surrounding the Pelham bankruptcy filing. *In re Pelham Enters., Inc.,* 376 B.R. 684 (Bankr. N.D. Ill. 2007).

-13-

Beverly testified that after the sale of the McDonald's restaurants, an accountant told her to remove the McDonald's logo from the Dices Enterprises checks. Beverly stated that when she ordered new checks, she instructed the bank to remove the logo from the checks, but did not request that the franchise number or store address be removed. Beverly explained that because the Dices Enterprises account number remained the same, she did not think it was necessary to remove the franchise number or the address of the formerly owned McDonald's restaurant.

Beginning in January of 2005, shortly after Pelham sold its McDonald's restaurant, Pelham's corporate checks no longer possessed the McDonald's reference. Instead, those checks began to refer to "Joey Buona's Pizzeria Grille." (Gail Ex. W.) However, after the McDonald's restaurants were sold and Joey Buona's was purchased, Gail was never paid with any checks from Pelham's account. (Gail Ex. L.)

Although Gail glanced at the financial statements and other documents furnished by the Ojedas at the time of the original loan, she did not closely examine those documents. She relied completely on Ronald's advice and recommendations at all times. Gail testified that she was not concerned about the loan given the original and subsequent collateral therefor, and because the Ojedas were making timely monthly interest payments as agreed on the original loan and the extensions until January 2006. It is undisputed that the negotiations for the deal and most of the subsequent communications involved Ronald and Ernest, not Gail or Beverly. There were only a few communications between Gail and Ernest.

-14-

The Ojedas filed a voluntary Chapter 7 bankruptcy petition on January 2, 2007. Thereafter, Gail filed the instant adversary proceeding on March 28, 2007. The Ojedas received a discharge pursuant to 11 U.S.C. § 727(a) on November 2, 2007.

The Court held an evidentiary hearing in this matter. The Ojedas moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52 and its bankruptcy analog Federal Rule of Bankruptcy Procedure 7052. Pursuant to Bankruptcy Rule 7052(c), the Court reserved ruling on the motion until the close of all the evidence. Thereafter, the Court took this matter under advisement. The Court denies the Ojedas' motion because the preponderance of all the evidence shows that by omission and silence, the Ojedas failed to disclose their true financial situation regarding the Bancshares stock and the sale of the McDonald's restaurants thereby creating the false pretense that they still owned both the stock and the restaurants and that those assets had value to support the collateral held by Gail for the unpaid loan balance, even though Gail's actions and omissions did not constitute justifiable reliance.

## III. APPLICABLE STANDARDS

### A.   Exceptions to the Discharge of a Debt

The main purpose of a discharge in bankruptcy is to give a debtor a fresh start. *See Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The United States Supreme Court

-15-

has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). *See also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001).

**B.    11 U.S.C. § 523(a)(2)(A)**

Pursuant to the complaint, Gail alleges that the extensions of the loan to the Ojedas, not the original loan itself, were obtained by false pretenses, false representations, and/or actual fraud. Specifically, Gail contends that the Ojedas' failure to inform her of the sale of Pan American Bank and the reverse stock split by which the 160,000 shares of Bancshares stock that had been pledged for the original loan became 1,600 shares of Cermak stock, constituted a fraud. Gail alleges that the Ojedas' actions, conduct, and omissions regarding the status of the 160,000 shares of the Bancshares stock were made with the intent to trick Gail into thinking that the loan remained fully secured with valuable collateral. Further, such actions on the part of the Ojedas enabled them to obtain multiple extensions of the loan from Gail.

In addition, Gail alleges that the sale of the two McDonald's restaurants was never disclosed. According to Gail, the Ojedas actively and repeatedly misrepresented to her for

-16-

two years that they, through Pelham and Dices Enterprises, continued to own these restaurants by making interest payments to Gail using corporate checks that referenced McDonald's. Gail contends that the Ojedas made these false representations to her in order to obtain extensions on the repayment deadline for the $600,000 principal and to prevent Gail from instituting a collection action. Gail states that she relied upon these alleged false representations which were made with fraudulent intent. Gail seeks a determination that the $600,000 principal debt, plus attorney's fees, costs, and unpaid interest should be determined to be non-dischargable under 11 U.S.C. § 523(a)(2)(A).

One issue the Court must address is the amount of the alleged non-dischargeable debt. Gail contends that the debt consists of the original $600,000 principal loan, plus interest (including attorney's fees and costs) from the date the Ojedas stopped paying—January 2006. On this point, however, Gail is mistaken. Section 523(a)(2)(A) excepts from discharge a debt for money or an extension, renewal, or refinancing of credit *"to the extent obtained by* false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A) (emphasis supplied). Thus, non-dischargeability is limited to the portion of the debt directly attributable to false pretenses, a false representation, or fraud. *See Baytree Nat'l Bank & Trust Co. v. Christensen (In re Christensen)*, Bankr. No. 04 B 17486, Adv. No. 04 A 3646, 2005 WL 1941231, at *5 (Bankr. N.D. Ill. Aug. 12, 2005) (*citing FTC v. Austin (In re Austin)*, 138 B.R. 898, 915 (Bankr. N.D. Ill. 1992); *McCullough v. Suter (In re Suter)*, 59 B.R. 944, 946-47 (Bankr. N.D. Ill. 1986)). In the matter at bar, it is undisputed that the Ojedas did not obtain the original $600,000 principal by fraud, false pretenses, or

-17-

false representations. Thus, only the unpaid interest from January of 2006, plus attorney's fees and costs, which were not specified or quantified at trial, are potentially non-dischargeable.

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) covers more than just a debtor obtaining money or property by false pretenses, a false representation, or actual fraud. *Freer v. Beetler (In re Beetler)*, 368 B.R. 720, 728 (Bankr. C.D. Ill. 2007). It also encompasses a situation where the debtor obtains an extension, renewal, or refinancing of credit by such wrongful conduct. *Id.* Renewal of a debt may be excepted from discharge even though the creditor did not extend "new money" to the debtor at the time of the renewal. *Bremer Bank, N.A. v. Wyss (In re Wyss)*, 355 B.R. 130, 135 (Bankr. W.D. Wis. 2006).

The Seventh Circuit Court of Appeals has not addressed the issue of whether a fraudulently induced forbearance constitutes an extension or renewal of credit for purposes of § 523(a)(2)(A). *Beetler*, 368 B.R. at 728. Several lower courts within the Seventh Circuit, however, have taken the position that forbearance from enforcing contractual rights

-18-

constitutes an extension or renewal of credit under § 523(a)(2)(A). *Id.* at 728-30 (collecting cases). Other circuit courts take the position that forbearance can be an extension or renewal of credit. *Id.* at 730 (collecting cases). The Court agrees with the view that a fraudulently induced forbearance may constitute an extension or renewal of credit for purposes of § 523(a)(2)(A). "The elements of proof necessary to establish such fraudulently-induced forbearance include 'discernable harm to the creditor in the sense that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that the remedies lost value during the extension period.'" *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera),* 373 B.R. 878, 885 (Bankr. C.D. Ill. 2007) (*quoting Beetler,* 368 B.R. at 730-31). *See also Wyss,* 355 B.R. at 136.

In the matter at bar, there is no proof that Gail's forbearance lost any value or that it cost her anything. Indeed, the testimony at trial indicated that at the time of the sale of the McDonald's restaurants, had any of the proceeds been used to repay Gail's loan, the benefits of § 1031 for the like-kind exchange of the McDonald's sale proceeds would have been lost. If any proceeds were used to pay off creditors other than those of the restaurants, with the balance reinvested in Joey Buona's, the Ojedas would have lost the tax deferral benefit of § 1031 and all sale proceeds would be subject to tax claims of the government ahead of Gail's claim.

Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and a false representation. 11 U.S.C. § 523(a)(2)(A); *Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). A single test was applied to all

-19-

three grounds even though the elements for each exception vary under common law. *Jairath*, 259 B.R. at 314. The Seventh Circuit Court of Appeals made it clear, however, that misrepresentation and reliance thereon are not always required to establish actual fraud. *McClellan v. Cantrell*, 217 F.2d 890, 894 (7th Cir. 2000).

### 1. False pretenses or false representation

In order to except a debt from discharge due to false pretenses or a false representation under § 523(a)(2)(A), the creditor must establish the following elements: (1) the debtor made a false representation of fact (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive, and (3) the creditor justifiably relied on the false representation. *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004); *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 710 (Bankr. N.D. Ill. 2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one factor is outcome determinative. *Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

-20-

> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (*quoting Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd in part*, 146 B.R. 269 (D. Colo. 1992)). *Accord John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192 B.R. at 928. "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* Silence or concealment may constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002).

A false representation can be shown through conduct and does not require a spoken or written statement. *Jairath*, 259 B.R. at 314. In other words, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would

-21-

otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259,

263 (Bankr. N.D. Ill. 1992).

### 2. Actual fraud

The Seventh Circuit Court of Appeals defined the term "fraud" for purposes of §

523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious
> means which human ingenuity can devise and which are
> resorted to by one individual to gain an advantage over
> another by false suggestions or by the suppression of
> truth. No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another
> is cheated.'

*McClellan*, 217 F.3d at 893 (*quoting Stapleton v. Holt*, 250 P.2d 451, 453-54 (Okla. 1952)).

"Actual fraud" is not limited to misrepresentation, but may encompass "any deceit, artifice,

trick, or design involving direct and active operation of the mind, used to circumvent and

cheat another[.]" *Id.* (internal quotation omitted). Hence, a different analysis must be

utilized when a creditor alleges actual fraud. *Id.* The *McClellan* court opined that because

common law fraud does not always take the form of a misrepresentation, a creditor need not

allege misrepresentation and reliance thereon to state a cause of action for actual fraud under

§ 523(a)(2)(A). *Id.* Rather, the creditor must establish the following: (1) a fraud occurred;

(2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the

subject of the discharge dispute. *Id.* at 894. The fraud exception under § 523(a)(2)(A) does

not reach constructive frauds, only actual ones. *Id.* The existence of fraud may be inferred

if the totality of circumstances presents a picture of deceptive conduct by the debtor that

-22-

indicates he intended to deceive or cheat the creditor. *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332 B.R. at 572.

### 3. Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or actual fraud–requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). "Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances. *Kucera*, 373 B.R. at 884; *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). The determination of intent is a question of fact to be decided by the bankruptcy court. *Howard*, 339 B.R. at 919.

### 4. Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a less demanding standard than reasonable reliance and requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal

-23-

quotation omitted). Justifiable reliance is an intermediate level of reliance that falls somewhere between the more stringent "reasonable reliance" guidepost and the lenient "reliance in fact." *Id.* at 74-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) *(quoting Field v. Mans*, 516 U.S. at 70). "However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) *(quoting Zirkel v. Tomlinson (In re Tomlinson)*, Bankr. No. 96 B 27172, Adv. No. 96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."). *See also Westfall*, 379 B.R. at 805 *(citing Mayer)*.

-24-

## IV. DISCUSSION

The Ojedas' alleged wrongful conduct did not occur when they originally obtained the $600,000 loan. Rather, Gail complains of the Ojedas' actions with respect to their subsequent failures and omissions to advise her of the Pan American Bank sale, the attendant reverse stock split of the Bancshares stock into Cermak stock, and the sale of the McDonald's restaurants and the reinvestment of some of those proceeds in Joey Buona's without repayment in full of the $600,000 principal amount.

When the Ojedas entered into the 2001 Note, they continued to pledge as security Ernest's 160,000 shares of Bancshares stock even though those shares no longer existed at that time, but rather, had been reduced to 1,600 shares of Cermak. As a result of the sale of Pan American Bank to JD Financial, Ernest did not have an interest in Bancshares or Pan American Bank when the Ojedas signed the 2001 Note. The 2001 Note specifically stated that payment "is secured by Borrower's pledge to Lender of 160,000 shares of Pan American Bank. . . ." (Gail Ex. B.) The Court finds that at no time during the discussions leading to the execution of the 2001 Note, did the Ojedas inform Gail or Ronald that Pan American Bank had been sold, that Ernest was no longer chairman of the boards of Bancshares and Pan American Bank, that the name of Bancshares had been changed to Cermak, or that there was a reverse stock split that rendered the pledged stock shares virtually worthless.

The Court finds that the renewed pledge of the Bancshares stock by the Ojedas to Gail in 2001, after Pan American Bank had been sold, was a false and misleading representation. Moreover, the Ojedas' failure to inform Gail of the sale, the reverse stock split, the name change to Cermak, and the fact that those shares were worthless constituted

-25-

an intentional misleading omission. The Court finds that the Ojedas' conduct in failing to disclose the diminished value of the pledged stock amounted to false pretenses and misrepresentation by omission. The Ojedas' continued pledge of Ernest's 160,000 shares of Bancshares stock after Pan American Bank had been sold and the shares became 1,600 shares in Cermak constituted a false and misleading representation of a material fact. These deliberate omissions regarding the value and material change in the Bancshares stock pledged as collateral constitute dishonest conduct that § 523(a)(2)(A) is designed to address.[11]

The strongest evidence in favor of the Ojedas is their timely payment of interest until January 2006. However, that fact, along with their complete failure to advise of the change in their financial situation, as they agreed to do in their personal financial statement, had the effect of lulling Gail into a false sense of security and an actual belief that the collateral for the promissory notes still existed and that it was as valuable as when the loan was originally made in 1998.

The Court further finds that the Ojedas' subsequent failure to inform Gail of the sale of the McDonald's restaurants in October of 2004 was materially misleading and designed to deceive Gail in order to obtain an extension of the past due date of repayment of the $600,000 principal indebtedness. The corporate guarantees of Pelham and Dices, Inc. were

---

[11]   The record is not clear with respect to when the undated Second Note was executed. As a result, the Court cannot determine whether the sale of Pan American Bank occurred prior to the time the Ojedas signed the Second Note or whether Ernest still owned the 160,000 shares of Bancshares stock when the Second Note was executed. Accordingly, the Court will not make any findings that the Ojedas made misrepresentations in connection with their execution of the Second Note.

-26-

obtained based on the understanding that they were backed by the continued successful operations of the McDonald's restaurants. Although security interests in the underlying assets of Dices Enterprises and Pelham were requested, Ronald and Gail were told that the McDonald's franchise agreements prohibited same. Thus, Gail did not have any liens on the restaurant assets of Dices Enterprises or Pelham, and was not paid from the sale proceeds when the restaurants were sold. After the sale, the corporate guarantees were no longer backed by the McDonald's restaurants (although Dices, Inc.'s guarantee never was), and this fact was not disclosed to Gail until the Ojedas stopped paying interest on the loan in January of 2006.

The Court finds that the Ojedas were not under a contractual duty to inform Gail of the sale of the McDonald's restaurants. Hence, their failure to inform Gail of the sale of the restaurants, in and of itself, did not constitute a misrepresentation. However, the failure to inform her of the sale, along with their continued use of the Dices Enterprises checks that contained the McDonald's information, created a false impression that the Ojedas had a continued interest in the restaurants. These actions and omission on the part of the Ojedas constitute false pretenses for purposes of § 523(a)(2)(A).

Next, based on the evidence, the Court reasonably infers an intent to deceive on the part of the Ojedas because the facts portray a clear cut "picture of deceptive conduct" by them. *See Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005). First, the Court finds that the Ojedas knowingly misrepresented and misled Gail with respect to the value and status of Ernest's interest in the Bancshares stock for the purpose of deceiving Gail into not calling the loan and continuing to extend the time for

-27-

repayment of the $600,000 indebtedness. The Ojedas were aware in 2001 that Ernest did not own 160,000 shares of Bancshares stock. Nevertheless, they signed the 2001 Note and made the representation to Gail that Ernest continued to own that stock. The Court finds that the Ojedas knowingly intended to deceive Gail of the true status of Pan American Bank, Bancshares, and Ernest's stockholdings therein. The Ojedas' pledge of the Bancshares stock in the 2001 Note when they knew that Ernest no longer owned 160,000 shares of that stock demonstrates an intent to deceive Gail. Based on these actions, the Court can reasonably infer an intent to deceive on the part of the Ojedas.

Second, the Court finds that the Ojedas' failure to inform Gail of the sale of the McDonald's restaurants, and their subsequent decision to make payments to Gail, after the sale of the McDonald's restaurants, solely with Dices Enterprises corporate checks, which contained the McDonald's name and other information relating to the McDonald's restaurant, establishes that the Ojedas intended to deceive Gail with respect to their lack of any continued ownership of the restaurants. Further, the Court finds that after the sale of the McDonald's restaurants, the Ojedas made payments to Gail only with Dices Enterprises checks because they intended to deceive Gail into believing that they still owned the McDonald's restaurants. Ernest testified he knew that the McDonald's restaurants were an important factor when Ronald and Gail were considering whether to make the loan. The Court finds that the Ojedas' failure to inform Gail of the sale of the restaurants, which resulted in Pelham, the one guarantor on the loan who owned one of the restaurants, no longer having an interest therein, along with the deceptive conduct with respect to the use of the Dices Enterprises checks to pay Gail, was misleading and lulled Gail into a false sense

-28-

of security which therefrom she did not demand immediate repayment of the $600,000 principal indebtedness.

The Court finds Beverly's testimony that she did not think it was necessary to remove the franchise number and restaurant address from the Dices Enterprises check stock incredible. Beverly was an astute and experienced businesswoman who should have known that any reference to the formally owned McDonald's restaurant on the Dices Enterprises check stock would create the false impression that Dices Enterprises continued to own and operate the restaurant. In addition, Beverly's testimony that her accountant told her to remove only the McDonald's logo does not obviate the false impression that Dices Enterprises continued to own and operate the restaurant.

Ernest testified that he did not intend to deceive Ronald and Gail with the use of the Dices Enterprises checks. Rather, according to Ernest, he and Beverly were simply utilizing the existing check stock which had the McDonald's information on it. However, when questioned why new Dices Enterprises checks were ordered with the franchise number and address of the restaurant after the sale in October of 2004, Ernest could not explain the rationale behind this action other than to say that the accountant told him to keep the Dices Enterprises account open.

The Court finds that the continued reference to the McDonald's restaurant on the Dices Enterprises checks was an intentional, deceitful act on the part of the Ojedas fostered to create the impression that Dices Enterprises continued to own and operate the restaurant. The Ojedas' payment of interest to Gail strictly with the Dices Enterprises checks and not with the Pelham checks demonstrates their intent to mislead Gail to believe that Dices

-29-

Enterprises continued to own the McDonald's restaurant. Indeed, Gail testified that she drew this very conclusion.

Next, the Court must determine whether Gail has met the justifiable reliance element of proof required under § 523(a)(2)(A). Gail argues that she relied on the Ojedas' original financial statement, their continued interest payments through January of 2006, and their failure to reveal timely the sales of Pan American Bank and the McDonald's restaurants, which induced her to forbear in demanding repayment of the unpaid principal, interest, fees and costs. Gail's reliance causally related to the above described facts, but was not justifiable for the following reasons.

Looking at the qualities and characteristics of this particular plaintiff, and all the facts and circumstances of this particular matter, the Court concludes that Gail has not demonstrated that her actions constituted justifiable reliance. Indeed, she did little if anything in the entire history of the debtor-creditor relationship other than to take a few phone messages from Ernest for Ronald. Gail testified that she did not conduct any independent inquiry into the facts and circumstances surrounding the loan and the extensions. Rather, she testified that she relied solely on Ronald to handle all aspects of the loan to the Ojedas. The question then becomes whether Ronald, as Gail's husband and apparent agent, acted with justifiable reliance which can then be imputed to Gail. Absent that, Gail has not demonstrated justifiable reliance for purposes of the statutory requirement.

Ronald testified that he did not possess a college degree. However, he stated that he spent twenty-seven years as a deputy sheriff in Cook County, Illinois, and he was a police officer for the Village of Stone Park. Ronald also declared that he was in the wireless

-30-

communications business for thirty-five years and that he operates a wireless communications company that, at its height, grossed millions of dollars. Ronald also testified that since the 1990s he has acted as a venture capitalist and has made at least 25-30 other high-risk loans, charging high rates of interest, like the loan he made to the Ojedas. Hence, he is no novice at making substantial unconventional loans.

The Court finds that based on Ronald's sophistication as a successful businessman in the wireless communications area, as well as his experience making high-risk loans, he should have made some further inquiry when he learned that Pan American Bank's operations and value were questionable in December of 1999. Ronald obtained the guarantees of Dices, Inc. and Pelham as additional collateral for the loan extension, but he did not request any current financial data from these companies. In fact, as previously discussed, Dices, Inc. operated as a management company and did not own any substantial assets. Hence, the guarantee from Dices, Inc. was virtually worthless. Moreover, the financial statements furnished at the outset of the transaction were from Pelham and Dices Enterprises, not Dices, Inc. (Gail Exs. H & I.) Thus, Ronald took a corporate guarantee from a company with no substantial assets and with no supporting financial documentation.

Ronald testified that during the Ojedas' approximate eight year loan period he did not ask for updated financial information on the McDonald's restaurants, nor did he request updated financial information from Dices, Inc., Dices Enterprises, Pelham, or the Ojedas. Ronald admitted that reasonable diligence in the lending industry includes obtaining periodic updated financial statements. He further conceded that procuring such updated financial statements would constitute good business practice. Ronald stated that he did not request any

-31-

updated financial information because the Ojedas made all of the interest payments in a timely fashion.

This matter is not like the situation where the lenders and borrowers are close friends, and as a result, the borrowers use their close relationship with the lenders to induce them to make the loan extensions, make false representations to the lenders who, as close friends, take those representations as true, and then fail to make any further inquiry because of their relationship with the borrowers. *See Daly v. Braizblot (In re Braizblot)*, 194 B.R. 14, 21 (Bankr. E.D.N.Y. 1996). In *Braizblot*, the court found that the lenders had justifiably relied on the borrowers' representations because of the nature of their relationship. *Id.* Here, the Ojedas and Ronald and Gail were introduced by a neighbor of Ronald and Gail. The couples did not have a close relationship that would have justified Ronald and Gail's reliance on the representations made by the Ojedas. In other words, this matter is not akin to the situation where Gail "relied upon the honesty of . . . old friend[s] who took advantage of [her]." *Loomas v. Evans (In re Evans)*, 181 B.R. 508, 514 (Bankr. S.D. Cal. 1995).

The Court finds that Ronald was aware in December of 1999 that the Bancshares stock was not worth the $800,000 he had originally thought it was worth. Ronald did seek the additional corporate guarantees from Dices, Inc. and Pelham, but after that, he did not request or obtain any further updated financial information. Ronald's awareness of Pan American Bank's problems was a red flag that should have invited more inquiry by him. Instead, he relied blindly on the Ojedas' continued payment of interest. His limited actions are simply too ostrich-like to constitute justifiable reliance to satisfy that element required by § 523(a)(2)(A). "[A] creditor may not close [his] eyes to red flags that demand inquiry

-32-

into the truth of a debtor's assertion." *Taylor v. Sykes*, No. 05 C 3717, 2005 WL 3542520, at *3 (N.D. Ill. Dec. 22, 2005).

The Court finds that a creditor's sole reliance on continued interest payments made by a debtor on a matured promissory note is not enough to constitute justifiable reliance. In light of the unconventional nature of this high risk loan of $600,000; its supposed short-term "bridge" status; the inability of the Ojedas to obtain another takeout lender over the years; and the long past maturity date of the last renewal note, Gail's failure to request an updated financial statement from the Ojedas and the corporate guarantors points to a lack of justifiable reliance, which offsets the apparent sole reliance by her on the continued payment of interest until January of 2006 when payment stopped and the true financial situations of the Ojedas and the corporate guarantors were revealed.

In sum, the Court finds that Gail failed to establish justifiable reliance. As a result, the Ojedas' debt to Gail is dischargeable and does not fall within the § 523(a)(2)(A) exception to discharge.


## V. **CONCLUSION**

For the foregoing reasons, the Court finds that the debt owed by the Ojedas to Gail is dischargeable.

-33-

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

ENTERED:

DATE: _4/22/8_

John H. Squires
United States Bankruptcy Judge

cc: See attached Service List

## SERVICE LIST

### Gail Goldberg v. Ernest J. Ojeda and Beverly V. Ojeda
Adversary Case No. 07 A 00192

Stuart Gimbel, Esq.
Joseph L. Matz, Esq.
Alon Stein, Esq.
Kamensky Rubinstein Hochman & Delott, LLP
7250 N. Cicero Avenue, Suite 200
Lincolnwood, IL 60712

Paul M. Bauch, Esq.
Carolina Y. Sales, Esq.
Kenneth A. Michaels, Jr., Esq.
Bauch & Michaels, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, IL 60604

Joseph A. Baldi, Esq.
Joseph Baldi & Associates
19 S. LaSalle Street, Suite 1500
Chicago, IL 60603

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606

A 34

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 7** |
| **ERNEST J. OJEDA,** | ) | **Nos.   07 B 00022** |
| **BEVERLY V. OJEDA,** | ) | |
| **Debtors** | ) | **Honorable John H. Squires** |
| | ) | **United States Bankruptcy Judge** |
| ------------------------------------------------------) | | |
| **GAIL GOLDBERG,** | ) | **Courtroom 680** |
| **Plaintiff,** | ) | |
| | ) | **Case No. : 07 B 00022** |
| **v.** | ) | |
| **ERNEST J. OJEDA,** | ) | |
| **BEVERLY V. OJEDA,** | ) | **Adv. No. A 00192** |
| **Defendants.** | ) | |

### NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Plaintiff, Gail Goldberg ("Goldberg"), by her attorneys, Stuart Gimbel, Joseph Matz, and Alon Stein, pursuant to 28 U.S.C. § 158 and Rule of Bankruptcy Procedure 8001 (a), hereby appeals to the United States District Court of the Northern District of Illinois from the final judgment and order of bankruptcy Judge Squires entered in this adversary proceeding on April 22, 2008, finding that the debt owed by Defendants/Appellees to Plaintiff/Appellant is dischargeable.

The names of all parties to the final judgment and order appealed from and the names and telephone numbers of their respective attorneys are as follows:

**For Plaintiff/Appellant, Gail Goldberg:** Joseph L. Matz, Stuart Gimbel, and Alon Stein, KAMENSKY RUBINSTEIN HOCHMAN & DELOTT, LLP, 7250 N. Cicero Avenue, Ste. 200 Lincolnwood, Illinois  60712, (847) 982-1776.

**For Defendants/Appellees, Ernest J. Ojeda and Beverly V. Ojeda:** Paul M. Bauch, Carolina Y. Sales and Kenneth A. Michaels, BAUCH & MICHAELS, LLC 53 W. Jackson, Suite 1115, Chicago, IL 60604 (312) 588-5000.



Goldberg respectfully requests that the April 22, 2008 final judgment and order finding that the debt owed by Defendants/Appellees to Plaintiff/Appellant is dischargeable be **REVERSED**.

Joseph L. Matz (1797093)
Stuart Gimbel (6194321)
Alon Stein (6278515)
KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP
7250 N. Cicero Avenue, Ste. 200
Lincolnwood, Illinois 60712
(847) 982-1776

Respectfully submitted,

**GAIL GOLDBERG**

s/s <u>Joseph L. Matz</u>
One of her attorneys

2

A 36

## CERTIFICATE OF SERVICE

Alon Stein, an attorney, on oath, certifies that he caused a copy of Plaintiff's *Notice of Appeal*, to be served upon counsel of record below electronically:

        Carolina Y. Sales, Esq.
        Paul M. Bauch, Esq.
        Bauch & Michaels, LLC
        53 W. Jackson Blvd., Suite 1115
        Chicago, Illinois 60604

this 1st day of May, 2008.


                          s/s <u>Alon Stein</u>

3

A37

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 07 B 00022 |
| | ) | Chapter 7 |
| ERNEST J. OJEDA and | ) | Judge John H. Squires |
| BEVERLY V. OJEDA, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| GAIL GOLDBERG, | ) | |
| | ) | Adversary No. 07 A 00192 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERNEST J. OJEDA and | ) | |
| BEVERLY V. OJEDA, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

For the reasons set forth in a Memorandum Opinion dated April 22, 2008, the Court finds that the debt owed by Ernest J. Ojeda and Beverly V. Ojeda to Gail Goldberg is dischargeable and does not fall within the 11 U.S.C. § 523(a)(2)(A) exception to discharge.

**ENTERED:**

DATE: 4/22/8

John H. Squires
**United States Bankruptcy Judge**

cc: See attached Service List

## SERVICE LIST

### Gail Goldberg v. Ernest J. Ojeda and Beverly V. Ojeda
### Adversary Case No. 07 A 00192

Stuart Gimbel, Esq.
Joseph L. Matz, Esq.
Alon Stein, Esq.
Kamensky Rubinstein Hochman & Delott, LLP
7250 N. Cicero Avenue, Suite 200
Lincolnwood, IL 60712

Paul M. Bauch, Esq.
Carolina Y. Sales, Esq.
Kenneth A. Michaels, Jr., Esq.
Bauch & Michaels, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, IL 60604

Joseph A. Baldi, Esq.
Joseph Baldi & Associates
19 S. LaSalle Street, Suite 1500
Chicago, IL 60603

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606