IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | |
|---|---|
| IN RE: ERNEST J. OJEDA and BEVERLY V. OJEDA, )<br><br>              Debtors. )<br>_____ )<br>GAIL GOLDBERG )<br><br>              Plaintiff, )<br>     v. )<br><br>ERNEST J. OJEDA & BEVERLY V. OJEDA, )<br><br>              Defendants. ) | Case No. 08 CV 2808<br><br>Chapter 7<br><br>Honorable Joan B. Gottschall<br><br>Magistrate Judge Sidney I. Schenkier<br><br>Bankr. No 07 B 00022<br>Adv. No. 07 A 00192 |

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION
HONORABLE JOHN H. SQUIRES**

**APPELLEES ERNEST AND BEVERLY OJEDA'S RESPONSE BRIEF**

Paul M. Bauch (ARDC # 6196619)
Carolina Y. Sales (ARDC #6287277)
BAUCH & MICHAELS, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, Illinois 60604
Office: (312) 588-5000
Fax: (312) 427-5709

**Attorneys for Ernest J. Ojeda &
Beverly V. Ojeda**

TABLE OF CONTENTS

Table of Authorities ...................................................................... iii

**RESPONSE BRIEF**

Statement of the Basis for Appellate Jurisdiction........................... 1

Counterstatement of Issues Presented on Appeal and the Applicable
    Standard of Appellate Review .............................................. 1

    Counterstatement of Issues ................................................. 1

    Standard of Review ............................................................ 1

Counterstatement of the Case......................................................... 3

    Nature of the Case.............................................................. 3

    Statement of Facts ............................................................. 4

Appellees' Response Argument........................................................ 15

    I.    THE BANKRUPTCY COURT'S FINDING THAT GAIL FAILED TO PROVE
          ALL ELEMENTS OF HER CLAIM BY A PREPONDERANCE OF THE
          EVIDENCE IS NOT CLEARLY ERRONEOUS........................................ 15

          A.   GAIL FAILED TO PROVE THAT SHE JUSTIFIABLY RELIED ON
               ANY MISREPRESENTATIONS........................................................ 16

               1.   Gail Did Not Justifiably Rely on the Ojedas' Alleged
                     Misrepresentations Regarding the Sale of the
                     McDonald's Restaurants................................................. 16

               2.   Gail Did Not Justifiably Rely on the Ojedas' Alleged
                     Misrepresentations Regarding the Sale of Pan
                     American Bank ............................................................. 19

               3.   Gail Did Not Justifiably Rely on the Ojedas' Monthly
                     Interest Payments......................................................... 22

               B.   GAIL FAILED TO PROVE THAT THE ALLEGED
                MISREPRESENTATIONS WERE EITHER THE PROXIMATE
                CAUSE OR THE CAUSE IN FACT OF HER ALLEGED DAMAGES.. 24

    II.  THE BANKRUPTCY COURT PROPERLY LIMITED 11 U.S.C.
          § 523(a)(2)(A) TO UNPAID INTEREST AND ATTORNEY'S FEES,
           BECAUSE THE OJEDAS DID NOT OBTAIN THE LOAN THROUGH
          FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD.. 28

Conclusion ................................................................................... 29

TABLE OF AUTHORITIES

## CASES

*American Pfauter, Ltd. v. Freeman Decorating Company/*
  *The Freeman Company*, 796 F. Supp. 347 (N.D. Ill. 1992) ................. 25

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985) ..................... 15, 16

*Bastian v. Petren Resources, Inc.*, 892 F.2d 680 (7th Cir. 1990) ................... 25

*Baytree National Bank & Trust Co. v. Christensen*
  (*In re Christensen*), Nos. 04 B 17486, 04 A 3646,
  2005 Bankr. LEXIS 1509 (Bankr. N.D. Ill. Aug. 12, 2005) ................. 29

*Bletnitsky v. Jairath* (*In re Jairath*), 259 B.R. 308
  (Bankr. N.D. Ill. 2001) ........................................................... 16

*Campfield v. Falcon Transport Co.*, No. 05 C 663,
  2006 U.S. Dist. LEXIS 75131 (N.D. Ill. Oct. 16, 2006) ...................... 25

*Field v. Mans*, 516 U.S. 59 (1995) .................................................... 16, 17

*First Bank of Elgin v. Nilles*, 35 B.R. 409 (N.D. Ill. 1983) ........................... 23, 24

*Freer v. Beetler* (*In re Beetler*), 368 B.R. 720 (Bankr. C.D. Ill. 2007) ........... 25, 26

*FTC v. Austin* (*In re Austin*), 138 B.R. 898 (Bankr. N.D. Ill. 1992) .............. 29

*Goldberg Securities, Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521
  (7th Cir. 1992) .................................................................... 15

*Grogan v. Garner*, 498 U.S. 279 (1991) ............................................... 15

*HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*,
  517 F.3d 454, 458 (7th Cir. 2008) ............................................ 22

*Heptacore, Inc. v. Luster* (*In re Luster*), 50 Fed. Appx. 781,
  (7th Cir. 2002) .................................................................. 25

*In re Neis*, 723 F.2d 584, 590 (7th Cir. 1983) ....................................... 2

*Johnson v. Curtis* (*In re Curtis*), No. 02-74988, Adv. No. 03-7335,
  Adv. No. 03-7336, 2006 Bankr. LEXIS 911
  (Bankr. C.D. Ill. May 24, 2006) ............................................. 16, 17

*Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*),
  139 F.3d 574 (7th Cir. 1998) ................................................. 27

*Loomas v. Evans* (*In re Evans*), 181 B.R. 508 (Bankr. S.D. Cal. 1995) ......... 22, 23

*Mayer v. Spanel Int'l Ltd.* (*In re Mayer*), 51 F.3d 670 (7th Cir. 1995) .......... 24, 25

*Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1999) .................................... 1, 15

TABLE OF AUTHORITIES

*Parts & Electric Motors, Inc. v. Sterling Electric, Inc.*,
    866 F.2d 228 (7th Cir. 1988) ............................................................ 2

*Rovell v. American National Bank* (*In re Rovell*), 194 F.3d 867
    (7th Cir. 1999) .............................................................................. 1, 2, 15

*Shaw Steel, Inc. v. Morris* (*In re Morris*),
    223 F.3d 548 (7th Cir. 2000) ........................................................... 15

*United States v. Groves*, 530 F.3d 506 (7th Cir. 2008) ..................... 15

*Vill. of San Jose v. McWilliams*, 284 F.3d 785 (7th Cir. 2002) ...... 15

## STATUTES

11 U.S.C. § 523(a) ................................................................. 1, 2, 14, 16,
                                                             27, 23-25,
                                                             28, 30

11 U.S.C. § 544(b) ............................................................... 26

11 U.S.C. § 548(a) ............................................................... 26

I.R.C. § 1031 ....................................................................... 10, 27

## RULES

Fed. R. Bankr. P. 8013 ....................................................... 1, 2, 15

## STATEMENT OF THE BASIS FOR APPELLATE JURISDICTION

Appellant Gail Goldberg ("Gail" or "Plaintiff") appeals from a final order of the United States Bankruptcy Court for the Northern District of Illinois (Squires, J.) On April 22, 2008 the bankruptcy court entered a final order and judgment (the "Order") in the Adversary Proceeding, *Gail Goldberg v. Ernest J. Ojeda & Beverly V. Ojeda*, Case No. 07 A 192 (the "Adversary Proceeding"), which arose in Appellees Ernest Ojeda ("Ernest") and Beverly Ojeda's ("Beverly") (collectively, the "Ojedas" or "Defendants") Chapter 7 bankruptcy case (Case No. 07 B 22). This Court has jurisdiction to hear the appeal from the Order pursuant to 28 U.S.C § 158(a)(1).

## COUNTERSTATMENT OF ISSUES PRESENTED ON APPEAL AND THE APPLICABLE STANDARD OF APPELLATE REVIEW

### COUNTERSTATEMENT OF ISSUES

1. Whether the bankruptcy court's findings that Plaintiff failed to prove the elements of justifiable reliance and causation under 11 U.S.C. § 523(a)(2)(A) were clearly erroneous.

2. Whether the bankruptcy court erred in holding that only the unpaid interest on Plaintiff's loan to Defendants as opposed to the unpaid principal and interest could potentially be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### STANDARD OF REVIEW

A district court may reverse a bankruptcy court's factual findings, "whether based on oral or documentary evidence," only if such findings are clearly erroneous. Fed. R. Bankr. P. 8013; *Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir. 1999). A court's factual findings are clearly erroneous if the reviewing court is "left with the

definite and firm conviction that a mistake has been committed." *United States v. Groves*, 530 F.3d 506, 510 (7th Cir. 2008). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). In order for a decision to be clearly erroneous, it "must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir. 1988). It follows that the district court cannot overturn the bankruptcy court's factual findings by engaging in its own findings of fact and weighing the evidence in Gail's favor, as she requests. *See In re Neis*, 723 F.2d 584, 590 (7th Cir. 1983) (holding that the district court erred in engaging in additional fact findings and in basing its decision on these additional facts).

Gail does not argue that the bankruptcy court applied an incorrect legal standard when it held that she failed to meet the "justifiable reliance" element of her claim. Whether Gail justifiably relied on any false representations is a mixed question of fact and law. *Rovell v. American Nat'l Bank* (*In re Rovell*), 194 F.3d 867, 870. "When the facts are established and the relevant standard is undisputed, the only remaining question can be 'whether those facts satisfy the relevant standard.'" *Id.* Mixed questions of fact and law are also reviewed for clear error. *Id.* at 871. In order to prevail on this appeal, Gail must essentially demonstrate that no reasonable factfinder could have reached the conclusions that the bankruptcy court reached on the evidence presented at trial. This is an insurmountable burden.

Ample evidence was presented to support the bankruptcy court's findings. Gail's disagreement with (and any perceived unfairness of) those findings provides no grounds for relief on this appeal.

After this Court has completed its appellate review, it may affirm, modify, or reverse the Order, or it may remand the matter to the bankruptcy court with instructions for further proceedings. Fed. R. Bankr. P. 8013.

## COUNTERSTATEMENT OF THE CASE

### NATURE OF THE CASE

On January 2, 2007, Ernest and Beverly filed a voluntary Chapter 7 bankruptcy petition. On March 28, 2007, Gail filed the Adversary Proceeding for non-dischargeability under 11 U.S.C. § 523(a)(2)(A) against the Ojedas. On November 2, 2007, the Ojedas received a discharge pursuant to 11 U.S.C. § 727(a). On February 25, 26, and 27, 2008, this matter was tried before the bankruptcy court upon Gail's complaint. On April 22, 2008, the bankruptcy court entered the Order finding that the debt owed by the Ojedas to Gail is dischargeable. The bankruptcy court held that Gail's inaction during the eight year term of the loan did not meet the justifiable reliance standard required for recovery under § 523(a)(2)(A). The bankruptcy court found that Gail solely relied on the Ojedas' continued monthly interest payments in deciding not to accelerate the $600,000 loan. Gail failed to prove that she actually and justifiably relied on the omissions regarding the Ojedas' sale of their McDonald's restaurants and the sale of Pan American Bank. Furthermore, Gail failed to prove that her forbearance in exercising her

collection rights proximately caused her injury. In addition, the bankruptcy court held that the only portion of the debt that potentially could be held non-dischargeable was the unpaid interest and not the principal amount of the debt. The bankruptcy court entered judgment in the Ojedas' favor. This Court should affirm because the bankruptcy court's factual findings are not clearly erroneous.

## STATEMENT OF FACTS

The Ojedas were entrepreneurs and restauranteurs who met Gail and her husband, Ronald Goldberg ("Ronald") (collectively, the "Goldbergs"), prior to August of 1998 through George Tomasziewicz ("George"), a loan broker. (Trial Tr. Feb. 25, 2008, 159:7-13.) Gail was a former high school teacher, and Ronald was an entrepreneur engaged in the wireless phone business and a "high risk" private lender. (*Id*. at 9:4-13; Trial Tr. Feb. 26, 113:3-115:9; Order at 30-31.) George was the Goldbergs' neighbor, who brought Ronald numerous loan proposals, which Ronald and George would discuss in Ronald's kitchen on an informal basis. (Trial Tr. Feb. 25, 26:19-27:7; Order at 3; Trial Tr. Feb. 26, 116:6-117:7.) George brought the parties together so the Ojedas could obtain a $600,000 loan from the Goldbergs. (Trial Tr. Feb. 26, 43:16-44:2.) The contemplated loan was to be a short-term bridge loan that would pay off Ernest's $600,000 loan from Richmond Bank. (Gail Ex. U; Trial Tr. Feb. 26, 44:3-8, 52:2-8; Order at 3.)

The Ojedas provided the Goldbergs with a personal financial statement, dated April 3, 1998, which reflected that Ernest owned 160,000 shares of "Pan American Bank" (the "Bank") stock with a "value" of $800,000. (Gail Ex. F; Order at

3-4.) The financial statement disclosed that this value was based on cost derived from an original issue price of five dollars per share. (*Id*.) The Bank was owned by Pan American Bancshares, Inc., a Delaware corporation ("Bancshares"). Bancshares was the holding company that owned all of the outstanding shares of the Bank, an Illinois banking corporation. (Gail Ex. P at 7; Order at 3.)[1]

The Ojedas also provided the Goldbergs with a draft consolidated financial statement for Bancshares, which revealed a decline in the book value of the shareholder's equity of the Bank, as well as a history of operating losses. (Gail Ex. O; Trial Tr. Feb. 26, 47-48; Order at 5.) The August 3, 1998 cover letter from Bancshares' attorney, which was addressed to Ronald and delivered with the Bancshares financial statement, explicitly stated that the book value of the Bancshares stock had declined to $1.94; therefore, at the time of the loan, Ernest's stock had an aggregate book value of approximately $300,000. (Gail Ex. O; Trial Tr. Feb. 26, 144:3-145:11.) Gail did not know of the existence of this letter to Ronald, and she did not recall whether Ronald told her that he received Bancshares' financial statement. (Trial Tr. Feb. 25, 28:1-14.) The Ojedas provided the Goldbergs with financial statements for Pelham Enterprises, Inc. ("Pelham") (the Ojedas' wholly owned corporation) and Dices Enterprises (the Ojedas' proprietorship) and their federal income tax return for 1997. (Gail Exs. H-J; Trial Tr. Feb. 26, 47:1-18; Order at 4.) Gail did not review any of these documents.

---

[1]    Ernest actually owned 160,000 shares of Bancshares stock. The bankruptcy court found that this discrepancy was not material. *(*Order at 26, 32.)

In August of 1998, the Goldbergs made a $600,000 loan to the Ojedas. The loan was intended to be short-term and was evidenced by a secured promissory note (the "1998 Note") dated August 6, 1998. (Gail Ex. A; Order at 5.) The initial term of the loan was 60 days, and the interest rate was 18 percent. (*Id.*) The loan was secured by a pledge of Ernest's 160,000 shares of Bancshares stock. (Trial Tr. Feb. 25, 155:16-25; Order at 5) The terms of the 1998 Note required the Ojedas to pay accrued interest on September 6, 1998, and remaining principal and interest on October 6, 1998. (Gail Ex. A; Order at 5.)

In addition, on August 6, 1998, Ernest executed and delivered to the Goldbergs a hypothecation agreement that described the "Pan American Bank" stock being pledged as security for the 1998 Note. (Gail Ex. C.) At this time Ernest also tendered possession of the original stock certificate No. CS-001 reflecting the issuance of 160,000 shares of Bancshares stock to Ernest. (Gail Ex. N; Order at 5.) The Goldbergs retained possession of the stock certificate at all relevant times. (Trial Tr. Feb. 26, 53:24-54:1-5; Order at 6.) The Ojedas also executed an undated UCC-1 financing statement that described the collateral as 160,000 shares of "Pan American Bancshares." (Ojeda Ex. 4.) The Goldbergs did not file the UCC-1 financing statement with the Illinois Secretary of State. (Trial Tr. Feb. 26, 17:23; Order at 6.) The Goldbergs also failed to file a notice of either the stock power or the hypothecation agreement with the Bancshares stock registrar or transfer agent. (Order at 6.)

The Ojedas owned and operated a McDonald's restaurant through their proprietorship, Dices Enterprises. (Order at 3.) This restaurant was located at 405 North Wabash Avenue in Chicago, Illinois. (Order at 4.) Pelham, a corporation owned by the Ojedas, also owned a McDonald's restaurant located at 1951 North Western Avenue in Chicago, Illinois. (*Id*.) The Goldbergs claimed that they relied on the Ojedas' ownership of these two McDonald's restaurants when they made the loan. (Trial Tr. Feb. 26, 68:12-19; Order at 25-26.)[2] Ronald testified that before making the loan, he learned from a friend who worked at the McDonald's corporate office that the two restaurants were excellent producing locations. (Trial Tr. Feb. 26, 120:22-121:15.) The Goldbergs, however, did not condition the loan upon the Ojedas' continued ownership of the McDonald's restaurants. Because of prohibitions in the McDonald's franchise agreements, the Goldbergs did not obtain a security interest in the McDonald's restaurant assets. (Order at 26.)

After entering into the loan agreement, the Ojedas made monthly interest payments to the Goldbergs. The Ojedas were unsuccessful in their efforts to refinance the loan. (*Id*.) They did not repay the principal of the 1998 Note on its October 6, 1998 maturity date, but continued to make the monthly interest payments, which the Goldbergs continued to accept. (*Id*.)

After the 1998 Note matured, the Ojedas executed an undated note payable to the Goldbergs, which replaced the 1998 Note and extended the maturity date of the loan until December 1, 2000 (the "Second Note"). (Ojeda Ex. 2; Trial Tr. Feb. 26,

---

[2]    The financial statement and testimony both reflected that Dices Enterprises' store was "marginal," and not an excellent producing location, as Ronald assumed.

64:17-65:1-8.) The Second Note continued the pledge and grant of the security interest to the Goldbergs in the 160,000 shares of Bancshares. (Ojeda Ex. 2; Order at 6.) The Goldbergs sent monthly invoices to the Ojedas for interest due on the loan. Pursuant to the Second Note, the Ojedas made all of the monthly interest payments. (Order at 6.) The Ojedas did not pay the Second Note upon its maturity.

During 1998, the Bank was experiencing financial difficulties and was unable to raise additional capital as demanded by its regulators. (*Id.* at 6-7.) In 1998 or the first half of 1999, Bancshares, in response to the Bank's regulators, began to look for a purchaser for the Bank. (*Id.* at 7.) On October 5, 1999, Bancshares entered into a purchase agreement with JD Financial Group, Inc. ("JD Financial") pursuant to which Bancshares agreed to sell all of its interest in the Bank to JD Financial for $800,000. (*Id.*; Gail Ex. P.) In a second addendum to that purchase agreement, dated October 31, 1999, the purchase price was amended to $250,000, plus 4,000 shares of common stock of JD Financial, which subsequently became the new holding company for the Bank. (*Id.*) The sale of the Bank was reported in the local media outlets, including the Chicago Tribune. (Ojeda Exs. 5-8.) The sale of the Bank was also publically reported in filings with the Illinois Department of Banks and Real Estate and various federal banking regulators, including the Federal Deposit Insurance Corporation. (*Id.*)

Prior to the sale of the Bank, Ronald heard "rumors" from his own attorney that the Bank was in financial trouble. (Ojeda Exs. 3 & 4; Trial Tr. Feb. 26, 56:19-24, 132:11-133:12.) On December 28, 1999, Ronald wrote Ernest a letter expressing

concern over the financial condition of the Bank, his desire to obtain additional collateral to secure the loan, and the fact and substance of a prior conversation with Ernest discussing the same. (Ojeda Ex. 3.) In this letter, Ronald acknowledged that he had actual knowledge of the Bank's financial problems several months prior to the sale. Ronald stated: "Several months ago . . . with the concerns of the banks [*sic*] operational condition, my legal staff reviewed the loan documents and extensions." (*Id.*) In the same letter, Ronald confirmed a conversation with Ernest regarding his request for additional support for the loan. Ronald wrote: "Not mentioned in the documents however discussed with you would be an additional pledge and or guarantee of the McDonald Stores as the bank operations and value are questionable." (*Id.*)

Ronald stated that he thought that adding guarantees from Pelham and Dices Enterprises would provide necessary additional security to the 160,000 shares of Bancshares stock that the Ojedas had previously pledged. In an undated letter that was postmarked March 6, 2000, Ronald wrote to his attorneys advising them of his belief that the value of the Bancshares stock was inadequate to secure the Ojedas' loan, and suggesting that they negotiate to obtain additional guarantees and security in connection with the negotiation of an extension of the maturity date of the loan. (Ojeda Ex. 4.) Ronald wrote:

> As we discussed we consider the stock from the bank not worth the collateral value. [Ernest] has agreed to issue a corporate guarantee from his McDonald Stores. I would further suggest if you think the guarantee is not strong or protective enough that you ask for a pledge or something of his stock in the stores.

(*Id.*)

The Ojedas and the Goldbergs negotiated the extension of the Second Note for approximately eighteen months. He demanded additional "security" in the form of unsecured guarantees from the Ojedas' corporations: Pelham and Dices, Inc. (Dices, Inc. was a management company that did not own any McDonald's assets.) (Order at 4 n.1, 9-10, 26.) On November 1, 2001, Gail and the Ojedas finalized and executed another written extension in the form of a new secured promissory note (the "2001 Note") for the principal amount of $600,000. (Gail Ex. B.) Gail became the sole lender, and Ronald was no longer a party to the loan. Both Dices, Inc. and Pelham executed the 2001 Note as guarantors. (*Id.*) On November 29, 2001, Pelham and Dices, Inc. executed corporate guarantees. (Gail Ex. E.) Pursuant to the terms of the 2001 Note, the eighteen percent interest was payable monthly, and a final payment of interest and principal was payable on January 2, 2003. (Gail Ex. B.) The 2001 Note continued to be secured by the pledge of 160,000 shares of Bancshares stock. (*Id.*) The 2001 Note and the guarantees did not restrict the Ojedas, Pelham or Dices, Inc. from selling or otherwise disposing of the McDonald's restaurants. (Gail Exs. B & E.) Nor did they require the Ojedas to provide notice of any such sales or any periodic financial reporting. (*Id.*)

No further written agreements were entered into between the Ojedas and the Goldbergs with respect to the $600,000 loan after the 2001 Note. (Trial Tr. Feb. 26, 82:6-12.) On January 2, 2003, the maturity date of the 2001 Note, the Ojedas did not pay the principal amount of the loan. They continued to make prompt interest payments to Gail in the amount of $9,300 per month, and she continued to accept

such payments. (Ojeda Exs. 47-49.) Gail did not demand repayment of the loan. (*Id.* at 82:13-83:1.)

In 2004, the Ojedas began to explore the sale of the McDonald's restaurants. The Ojedas considered a sale because ongoing changes in the McDonald's corporate structure made the restaurants less attractive as investments. (*Id.* at 188-92.) The Ojedas had a significant deferred tax gain, however, that could be realized if they sold the restaurants. Thus, the Ojedas began to look for a new, "like-kind" business in which to invest the proceeds of the McDonald's sales and avoid recognition of the tax gain through a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code.

On October 1, 2004, Pelham and Dices Enterprises sold their interests in the two McDonald's restaurants and franchises for a gross purchase price of approximately $5,100,000. (Ojeda Ex. 43; Order at 11.) The proceeds of the sale were used to pay outstanding claims of the restaurants' creditors. (Ojeda Exs. 43 & 44; Order at 11.) The approximate $2,300,000 balance of the sale proceeds was deposited into a "Starker trust" pending investment in like-kind assets to be qualified under I.R.C. § 1031. (Order at 11.) The Ojedas did not repay Gail's loan, because, *inter alia*, on the advice of their attorneys and accountants, payment of the loan would have triggered recognition of serious tax consequences, including recognition of capital gain. (Order at 12.)

As the Ojedas were negotiating the sale of the McDonald's restaurants, they were also negotiating to purchase a restaurant called Joey Buona's Pizzeria Grille

("Joey Buona's") located at 160-164 East Superior Street in Chicago, Illinois. On December 31, 2004, Pelham entered into an asset purchase agreement with Joey Buona's Pizzeria Grille-Chicago, L.L.C. wherein Pelham acquired a restaurant business, including an assignment of a lease and option to purchase the real property, all personal property located on the premises and used in the operation of the restaurant, and certain intellectual property rights relating to the "Joey Buona's System." (Ojeda Ex. 46; Order at 12.) Pelham closed the purchase of the Joey Buona's restaurant in January of 2005, and the remaining sale proceeds from the McDonald's restaurants were invested in the purchase of the Joey Buona's. (Order at 12.) At the time, the Ojedas believed that the Joey Buona's transaction was a superior investment opportunity compared to the McDonald's restaurants.

On January 26, 2005, a press release was issued that announced a sale of Joey Buona's and disclosed the Ojedas as the purchasers of the restaurant. (*Id.*; Ojeda Ex. 45.) The Ojedas were on site at the Joey Buona's restaurant almost every day during the time Pelham owned and operated the restaurant. The Ojedas did not take any action to conceal their ownership of Joey Buona's from the Goldbergs. (Order at 12.) In fact, Beverly appeared on a local television show that promoted the Joey Buona's restaurant. (Trial Tr. Feb. 27, 50-52.) Pelham was unsuccessful in its operation of the Joey Buona's restaurant. Joey Buona's failed in February of 2006. Thereafter, Pelham filed a voluntary Chapter 7 bankruptcy petition on January 25, 2007. (Order at 12-13.)

The Ojedas made all of the monthly interest payments to Gail without fail until they defaulted in January of 2006. (Order at 13.) In total, the Ojedas made approximately 89 payments of interest in the amount of $801,000. (*Id*.) The Ojedas never repaid any of the principal on the $600,000 loan. Thus, although the loan between the Ojedas and the Goldbergs was initially intended as a short-term loan, it lasted for eight years, as the Ojedas paid interest as they agreed. (*Id*.)

Gail only glanced at the financial statements and other documents furnished by the Ojedas at the time of the original loan, but she did not closely examine those documents. (Order at 13; Trial Tr. Feb. 25, 9-15, 29-31.) She relied on her husband, Ronald's, advice and recommendations at all times. (Order at 13; Trial Tr. Feb. 25, 32.) Gail was not concerned about the loan, because the Ojedas were making the interest payments until January 2006. (Order at 13.) The loan negotiations and subsequent communications were between Ronald and Ernest, and not Gail or Beverly. There were only a few communications between Gail and Ernest. (*Id*.)

Ronald and Ernest had communications regarding the worsening financial condition of the Bank in 1999. The bankruptcy court made the factual finding that:

> based on Ronald's sophistication as a successful businessman in the wireless communications area, as well as his experience making high-risk loans, he should have made some further inquiry when he learned that Pan American Bank's operations and value were questionable in December of 1999.

(Order at 30.) The bankruptcy court ultimately found, as a matter of fact, that the Goldbergs did not justifiably rely upon the nondisclosure of the Bank sale, particularly because numerous red flags alerted them to the issues regarding the value of the Bancshares stock. (Order at 32-33.)

Furthermore, during the entire loan period, Ronald did not request any updated financial information on the McDonald's restaurants or from the Ojedas generally. (Trial Tr. Feb. 26, 110-11; 156:4-157:24; 159:21-160:3.) Ronald knew that during the loan period, the Ojedas also bought and sold another McDonald's restaurant in the Field Museum. (Trial Tr. Feb. 26, 120:1-11, 161:20-25.) Ernest informed Ronald about this sale, which Ronald did not consider to be an adverse development. (*Id.* at 120:12-21, 161:20-25.)

Similarly, when the Ojedas sold the other two McDonald's restaurants and purchased the Joey Buona's restaurant, the Ojedas did not consider this to be an adverse development. (*Id.* at 192-94.) Ernest testified that during the years he owned the McDonald's, the relationship between the McDonald's corporation and the franchisees became strained. (*Id.* at 188-89.) The Ojedas considered selling their restaurants after McDonald's planned to open another restaurant near their McDonald's on Western Avenue. (*Id.* at 190:2-6.) According to an impact study, the Ojedas' restaurant would be impacted approximately 15 percent or $600,000 in the first year. (*Id.* at 190:6-16.) In addition, the Ojedas' McDonald's restaurant on Wabash Avenue was experiencing difficulties because of nearby construction projects and street closings. (*Id.* at 191:1-21.)

The Ojedas viewed the Joey Buona's restaurants as an attractive investment, which they did not consider to be riskier than the McDonald's restaurants. In fact, they considered the Joey Buona's to be a better economic opportunity than McDonald's. (*Id.* at 10:16-19.) The Joey Buona's was a 16,000 square foot restaurant

with four floors and a seating capacity of approximately 800 people. (*Id.* at 193:17-25, 194:1-9.) The Ojedas negotiated an option to purchase the real estate, and they hoped to operate the Joey Buona's until they retired. (*Id.* at 10:6-19.) They did not want a fast-food restaurant, but wanted a restaurant where they could grow the business. (Trial Tr. Feb. 27, 41:21-42:3.)

## APPELLEES' RESPONSE ARGUMENT

### I.   THE BANKRUPTCY COURT'S FINDING THAT GAIL FAILED TO PROVE ALL ELEMENTS OF HER CLAIM BY A PREPONDERANCE OF THE EVIDENCE IS NOT CLEARLY ERRONEOUS.

The bankruptcy court properly found as a matter of fact that Gail failed to prove the elements required under 11 U.S.C. § 523(a)(2)(A) and that the entire debt owed by the Ojedas was dischargeable. The purpose of a personal bankruptcy case is to give a debtor a fresh start through a discharge of personal liability. *See Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof for each element of its claim. *Goldberg Securities, Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521, 524 (7th Cir. 1992). The burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Shaw Steel, Inc. v. Morris* (*In re Morris*), 223 F.3d 548, 552 (7th Cir. 2000).

## A. GAIL FAILED TO PROVE THAT SHE JUSTIFIABLY RELIED ON ANY MISREPRESENTATIONS.

This Court should affirm the bankruptcy court's ruling, because Gail failed to prove by a preponderance of evidence that she justifiably relied on any false representations or omissions. Reliance on a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a matter of the qualities and characteristics of the particular plaintiff. *Id.* at 76. As the Supreme Court explained: "Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naïve. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance." *Id.* Sophisticated parties may be held to a higher standard. *See, e.g., Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 316 (Bankr. N.D. Ill. 2001). Thus, Gail, through her complete reliance on her husband and agent, Ronald (an experienced money lender and owner of a multi-million dollar company who was represented by a sophisticated law firm) was properly held to the standard of a sophisticated money lender.

### 1. Gail Did Not Justifiably Rely on the Ojedas' Alleged Omissions Regarding the Sale of the McDonald's Restaurants.

The bankruptcy court correctly found that Gail failed to satisfy the justifiable reliance element of proof required under § 523(a)(2)(A) with respect to the alleged McDonald's restaurant omissions. A creditor who fails to prove justifiable reliance cannot have the debt excepted from discharge. *Johnson v. Curtis (In re Curtis)*, No. 02-74988, Adv. No. 03-7335, Adv. No. 03-7336, 2006 Bankr. LEXIS 911 at *28-29 (Bankr. C.D. Ill. May 24, 2006) (holding that the plaintiffs "failed to prove

justifiable reliance on the Debtor's willful misrepresentations by omission. The promised return of 100% within 15 days of the loan was a clear red flag that this was a high-risk speculative venture.") *Id.* at *29.

In this case, there was no due on sale clause in the loan documents, no contractual duty that the Ojedas report a sale of the McDonald's restaurants to Gail, no requirement that the Ojedas obtain Gail's consent to sell the McDonald's restaurants, no security interest in the McDonald's restaurant assets, and, therefore, no obligation that the sale proceeds of the McDonald's restaurants be applied to Gail's claim. In making its factual finding that Gail's "reliance" on the Ojeda's continued ownership of the McDonald's restaurant was not justifiable, the bankruptcy court looked at the qualities and characteristics of Gail, and all the facts and circumstances surrounding the loan. (Order at 29.) During the history of the loan, Gail's participation was limited to taking telephone messages from Ernest for Ronald. (Trial Tr. Feb. 26, 75:21-76:1.) Gail did not conduct any independent inquiry into the loan or the extensions; she relied solely on Ronald to handle all aspects of the loan. (Order at 29; Trial Tr. Feb. 26, 78:4-13.) The bankruptcy court then examined Ronald's actions and found that Ronald, acting as Gail's husband and apparent agent, did not act with justifiable reliance. His lack of justifiable reliance could then be imputed to Gail. (Order at 29.)

Ronald spent 27 years as a deputy sheriff in Cook County, Illinois, and he was a police officer for the Village of Stone Park. (Trial Tr. Feb. 26, 104:7-23.) Ronald was in the wireless communications business for 35 years and operates a

wireless communications company that grossed over one-hundred million dollars per year at its height. (*Id.* at 101:20-102:7.) He negotiated multi-million dollar bank loans and was experienced in the loan underwriting process, including the submission of financial statements. (*Id.* at 107:3-12.) Since the mid-1990s, Ronald acted as a venture capitalist and made at least 25-30 other high-risk loans, charging high rates of interest, like the loan he made to the Ojedas. (*Id.* at 112:25-116:3.) Ronald was not a novice at making substantial unconventional loans.

During the eight-year loan period, Ronald did not ask for updated financial information on the McDonald's restaurants, nor did he request an updated financial statement from Dices, Inc., Dices Enterprises, Pelham, or the Ojedas. Ronald testified that reasonable diligence in the lending industry includes obtaining periodic updated financial statements. (*Id.* at 102:20-104:6.) Procuring such updated financial statements was good business practice. (*Id.* at 111:24-112:24.) Notwithstanding, Ronald did not request any updated financial information on the Ojedas or any of their entities, simply because the Ojedas made all of the interest payments in a timely fashion. (*Id.* at 156:4-157:24.) Ronald simply assumed that the McDonald's restaurants were profitable:[3]

> Q: And throughout the loan, you were relying on the fact that Mr. Ojeda paid his bills every month, and the only time when he was late was maybe a week or when you were out of town?
> A: Correct.
> Q: And you felt that Mr. Ojeda had an excellent credit rating?

---

[3]    Dices, Inc. operated as a management company and did not own any substantial assets. The guarantee from Dices, Inc. was virtually worthless. (Order at 30.) The financial statements furnished at the outset of the transaction were from Pelham and Dices Enterprises—not Dices, Inc. (*Id.*; Gail Exs. H & I.) Thus, Ronald took a corporate guarantee from a company with no substantial assets and with no supporting financial documentation. (Order at 30.)

A: I believed he did.

Q: And you simply assumed the McDonald's were profitable based on your observation of the Ojedas' lifestyle, not on anything Mr. Ojeda said?

A: Well, the McDonald's continued to operate all the way through, so I would assume they were good.

Q: Based on the fact that they continued to operate?

A: And that he continued to pay his bills.

Q: But, again, you never asked for any financial statements as to what was really going on with the McDonald's?

A: Correct.

(*Id.* at 157:12-24.)

The Ojedas had no duty to disclose the sale of the McDonald's restaurants to Gail. (Order at 27.) The sale of the McDonald's restaurants was not an event of default under the loan documents. (Trial Tr. Feb. 26, 160:4-18.) In sum, the bankruptcy court found that Gail and Ronald were relying on the Ojeda's history of prompt payment, not their continued ownership of the McDonald's restaurants in forbearing from calling the loan. The bankruptcy court's finding that Gail did not justifiably rely on the Ojedas' continued ownership of the McDonald's restaurant was amply supported by the evidence and was not clearly erroneous.

### 2. Gail Did Not Justifiably Rely on the Ojedas' Alleged Misrepresentations Regarding the Sale of Pan American Bank.

The bankruptcy court found that Gail did not justifiably rely on the alleged misrepresentations regarding the Bancshares stock. Ronald was aware in December of 1999 that the Bancshares stock was not worth the $800,000 he had originally thought it was worth. (Order at 32.) Ronald testified that he heard "rumors" of the Bank's financial problems. (Ojeda Exs. 3 & 4; Trial Tr. Feb. 26, 56:19-24.) Several months later, Ronald advised his attorney that he considered the stock "not worth

the collateral value." (Ojeda Ex. 4.) Notwithstanding, he initially testified that his

seeking the corporate guarantees from Dices, Inc. and Pelham, had nothing to do

with his concerns over the value of the Bancshares stock. (Trial Tr. Feb. 26, 138:13-

20.)

> Q: Your request for the guarantees, corporate guarantees had nothing to do with your concerns over the value of the bank stock?
> A: No. It was just additional collateral.
> Q: And at this time you didn't know anything—know of any adverse developments with respect to the Pan American Bank in November of 1999?
> A: I had not known that there was any problems at the bank in 1999.
> Q: You thought it was just good business practice to get more guarantees?
> A: Yes.

(*Id.* at 138:17-139:3.) Later, however, Ronald's credibility was undermined when he

was confronted and questioned about the letter that he wrote to Ernest on

December 28, 1999, in which he stated:

> *Several months ago* the [*sic*], with the concerns of the bank's operational condition, my legal staff reviewed the loan documents and extensions. . . . Not mentioned in the documents however discussed with you would be an additional pledge and or guarantee of the McDonalds stores as the bank's operations and value are questionable.

(Ojeda Ex. 3) (emphasis added). When examined about this letter during trial, he

conceded that his request for the guarantees was related to the Bank's financial

problems, but that he did nothing to further investigate the financial circumstances

of the Bank:

> Q: Now, sir, we're going to go back to your Exhibit 3, your letter. What facts were provided to you that caused you to conclude that the bank's operations and value are questionable?
> A: Just a gut feel of a rumor. And at that point I felt that we would be better if we were to secure the interest in the McDonald's stores as well.

> Q: And you never asked George his opinion as to what might have been going on with the bank?
> A: No, sir.
> Q: Okay. Did you think of calling Mr. del Hierro, the bank's attorney, and asking him what was going on?[4]
> A: No.

(Trial Tr. Feb. 26, 150:12-151:1.) Gail now concedes that the request for guaranties bore a direct causal relationship to Ronald's concerns about the financial conditions of the Bank:

> when Ronald learned of possible financial difficulties relating to the bank, he took affirmative measures and immediately contacted Ernest Ojeda to inquire as to the circumstances and wrote him a letter asking for a UCC filing for the bank stock and seeking a guaranty. . . . In light of the circumstances, he asked for the guaranty that he wanted **and he got it!**

(Appellant Br. at 23-24.) In view of his conflicting testimony, the bankruptcy court, decided to discount Ronald's alleged reliance on the value of Bancshares' stock, finding that any reliance on any omissions regarding the financial condition of the Bank was not justified under the circumstances.

The bankruptcy court found that Ronald's sophistication as a successful businessman in the wireless communications area, as well as his experience making high-risk loans, should have caused him to make some further inquiry when he learned that the Bank's operations and value were questionable in December of 1999. (Order at 30.) The bankruptcy court found that "Ronald's awareness of Pan American Bank's problems was a red flag that should have invited more inquiry by him." (Order at 32.) The bankruptcy court weighed this evidence and appropriately

---

[4]     Mr. del Hierro, the Bank's attorney, previously provided Bancshares' draft financial statement to Ronald. (Gail Ex. O – Aug. 3, 1998 letter from Edwin S. del Hierro to Ronald.)

concluded that Gail did not justifiably rely on the Ojedas' alleged omissions regarding the Bank.[5]

### 3. Gail Did Not Justifiably Rely on the Ojedas' Monthly Interest Payments.

After weighing the Goldbergs' testimony and the documentary evidence submitted by the parties, the bankruptcy court properly found that Gail solely relied on the receipt of continued interest payments, and that such reliance was not justifiable. (Order at 33; Trial Tr. Feb. 26, 82:13-83:1.) The bankruptcy court's findings are supported by five major factors: (1) the loan to the Ojedas in the amount of $600,000 was high risk; (2) it had a short-term "bridge" status; (3) the Ojedas were not able to refinance the loan over several years; (4) the maturity date of the last renewal note had long passed; and (5) the Goldbergs never requested any updated financial statements from the Ojedas, Pelham or Dices, Inc. (Order at 33.) In view of these facts, the bankruptcy court appropriately found that Gail's sole reliance on the Ojedas' continued interest payments until January of 2006 was not justified. (*Id.*)

The Ojedas and the Goldbergs were introduced to each other by the Goldbergs' neighbor. The Ojedas and Goldbergs did not have a close relationship that would have justified the Goldbergs' reliance on the representations made by the Ojedas. The bankruptcy court found that this was not a situation where Gail

---

[5]    The bankruptcy court may be affirmed on this issue for the alternative reason that financial information regarding the Bank and its sale was public. (Ojeda Exs. 5-30.) "It is unnecessary to restate what is already in plain view of the investing public." *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC*, 517 F.3d 454, 458 (7th Cir. 2008). Therefore, Ernest had no obligation to restate to Ronald what was already stated to the public.

"relied upon the honesty of . . . old friend[s] who took advantage of [her]." *Loomas v. Evans* (*In re Evans*), 181 B.R. 508, 514 (Bankr. S.D. Cal. 1995). (Order at 32.)

Ronald relied blindly on the Ojedas' continued payment of interest. The bankruptcy court found that "Ronald's limited actions are simply too ostrich-like to constitute justifiable reliance to satisfy that element required by § 523(a)(2)(A)." (Order at 31.) Although Gail argues that the Ojedas' financial statement contained a provision requiring them to provide written notice of changes, she provided no evidence that she relied upon this provision in the financial statement. (Appellant Br. at 24.) On the contrary, Gail testified that she saw the financial statement but did not review it. (Trial Tr. Feb. 25, 25:11-20.) Ronald testified that he did not remember whether he discussed the Ojedas' financial statement with George or whether he read the fine print. (Trial Tr. Feb. 26, 118:13-119:25.) Moreover, there is no evidence that the Goldbergs relied on the original financial statement when they entered in to the 2001 renewal. In fact, the evidence is overwhelming that Ronald knew that there had been changes in the Ojeda's financial condition since the date of the original statement.

This case differs from *First Bank of Elgin v. Nilles*, in which the debtor backdated a financial statement and intentionally omitted material information, even though the bank requested his most recent financial statement before making the loan. 35 B.R. 409 (N.D. Ill. 1983). The *Nilles* court simply held that the debtor "had an obligation to provide the Bank not just with information which was technically 'not untrue' according to the four corners of the financial statement but

with a complete and accurate picture of his financial status *at the time of the loan*." *Id*. at 411 (emphasis added).

Here, Gail knew that the Ojedas bought and sold a McDonald's restaurant at the Field Museum after the loan funds were disbursed. Ronald did not consider this to be an adverse development. (Trial Tr. Feb. 26, 120:1-21.) Ronald also knew that the value of the Bancshares stock was problematic at best. Thus, the Goldbergs had actual knowledge that the Ojedas' financial situation did not remain static during the eight-year loan period. Notwithstanding this knowledge, the Goldbergs never requested an updated financial statement during the entire eight-year loan history. Gail's argument that she justifiably relied on the Ojedas updating their original financial statement is in substance an argument that she could rely on an eight-year old financial statement despite actual knowledge that changes to the Ojedas financial condition must have occurred. The bankruptcy court weighed the evidence in the Ojedas' favor by finding that Gail could not justifiably rely on the Ojedas' failure to update their eight-year old financial statement as a basis to declare the debt nondischargeable.

### B. GAIL FAILED TO PROVE THAT THE ALLEGED MISREPRESENTATIONS WERE EITHER THE PROXIMATE CAUSE OR THE CAUSE IN FACT OF HER ALLEGED DAMAGES.

The bankruptcy court correctly found as a matter of fact that Gail also failed to prove that the Ojedas' alleged omissions were the proximate cause of her damages. In order to "satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation *that was the cause-in-fact* of the debt the creditor wants excepted from discharge." (Order at 24.)

24

(emphasis added) (citing *Mayer v. Spanel Int'l Ltd.* (*In re Mayer*), 51 F.3d 670, 676 (7th Cir. 1995). "Cause in fact, often expressed as "but for" causation, involves an inquiry into the factual connection between the defendant's breach of duty and the plaintiff's injury." *American Pfauter, Ltd. v. Freeman Decorating Company/The Freeman Company*, 796 F. Supp. 347, 350 (N.D. Ill. 1992). A plaintiff demonstrates cause in fact "by showing that the defendant's action was a material element and a substantial factor in bringing about plaintiff's injury." *Campfield v. Falcon Transport Co.*, No. 05 C 663, 2006 U.S. Dist. LEXIS 75131 at *8 (N.D. Ill. Oct. 16, 2006).

The Seventh Circuit has not abandoned "the common law's universal requirement that the tort plaintiff prove causation." *Bastian v. Petren Resources, Inc.*, 892 F.2d 680, 682-86 (7th Cir. 1990). Similarly, the Seventh Circuit has not abandoned the proximate cause requirement of Section 523(a)(2)(A). *See Heptacore, Inc. v. Luster* (*In re Luster*), 50 Fed. Appx. 781, 784 (7th Cir. 2002) ("In order to establish non-dischargeability under § 523(a)(2)(A), a creditor must prove . . . that [it] sustained damages as a proximate cause of reliance on the false representation."). A creditor that files a claim under Section 523(a)(2)(A) must prove that it "sustained a loss or was harmed *as the proximate consequence of* her reliance on the misrepresentations." *Freer v. Beetler* (*In re Beetler*), 368 B.R. 720, 731 (Bankr. C.D. Ill. 2007) (emphasis added).

The bankruptcy court held that a fraudulently induced forbearance may constitute an extension or renewal of credit for purposes of § 523(a)(2)(A). If a

creditor claims that the debtor fraudulently induced forbearance, however, she must prove that she "had valuable collection remedies at the time of the misrepresentations, that she did not exercise those remedies because of the fraud, and that the remedies lost value during the time that the fraud was extant." *Freer v. Beetler*, 368 B.R. at 732. In sum, the creditor must establish the value of the forbearance remedy at the time of the fraud. The bankruptcy court found that Gail presented no competent evidence that her "forbearance lost any value or that it cost her anything." (Order at 18.) Thus, it concluded that Gail failed to prove that the alleged misrepresentation was either the cause in fact or the proximate cause of any injury. This finding is not clearly erroneous.

Gail now argues that she lost valuable collection rights because she would have called the loan upon learning of the McDonald's restaurants sale in 2004. (Appellant Br. at 27.) She argues that the Ojedas could have paid the $600,000 loan in full because (1) the Ojedas sent their accountant on a vacation through the Marriott Vacation Club; (2) they supposedly had over one million dollars of equity in the Joey Buona's restaurant; (3) the Ojedas could have prevented the Joey Buona's restaurant from failing; and (4) they "would have found a way to pay off their debt to Gail." (*Id*. at 8, 29.)[6]

Gail, however, failed to present any evidence of what she would have likely recovered if she had accelerated the loan and filed a collection action against the Ojedas and Pelham in the fall of 2004. Gail had no security interest in the

---

[6]    At this time, the Ojedas owned a Marriott timeshare in Desert Springs. The Court may take judicial notice of the Ojedas' Schedule B filed in their bankruptcy (Case No. 07 B 22, Docket #13, Jan. 16, 2007), which lists this timeshare.

McDonald's restaurants assets. The Ojedas were free to sell the McDonald's restaurant assets and reinvest the proceeds in the Joey Buona's without her consent. Moreover, the evidence at trial indicated that at the time of the sale of the McDonald's restaurants, if the Ojedas used the sale proceeds to repay Gail's loan, the benefits of the § 1031 like-kind exchange of the McDonald's sale proceeds would have been lost. (Order at 18.) If any proceeds were used to pay off creditors other than those of the McDonald's restaurants, the sale proceeds would be subject to tax claims of the government ahead of Gail's claim. (*Id.*) Moreover, if Pelham filed bankruptcy upon Gail's acceleration of the loan, Pelham's upstream guaranty of the Ojedas' debt could have been avoided as a fraudulent transfer under 11 U.S.C. §§548(a) and 544(b), thereby preventing Gail's recovery from Pelham's estate. *See, e.g., Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*), 139 F.3d 574, 579-80 (7th Cir. 1998) (corporate debtor's guarantee of shareholder's obligation may be subject to avoidance as constructive fraudulent transfer).

Gail's argument that "[i]t was not until approximately a year later that the Ojedas had run their new venture into the ground, leaving Gail with no collection remedies" misses the point. (*Id.* at 29-30.)[7] She was required to present evidence of the decline in value of her collection remedies. The bankruptcy court properly declined to find a decline in value without an evidentiary showing. Instead, the

---

[7]    The bankruptcy court noted its issuance of a Memorandum Opinion describing the circumstances of Pelham's bankruptcy filing. (Order at 12 n.10.) Pelham's bankruptcy trustee filed an adversary against the seller of the Joey Buona's restaurant, which the parties settled. *See* Case No. 07 B 22, Docket #68, Jan. 10, 2008 Order Approving Compromise. Gail is likely to receive substantial distributions on her claims in both the Pelham and Ojeda bankruptcy cases. Gail has already received over $800,000 payment on her $600,000 loan. Thus, her only real objective on this appeal is whether she will be entitled to collect her "juice."

27

bankruptcy court weighed the testimony and documentary evidence to find that Gail submitted no proof that her "forbearance lost any value or that it cost her anything." (Order at 18.) Gail provided no evidence that the alleged misrepresentations were either the "but for" cause or the proximate cause of her damages. Gail did not show that she would have recovered more on the loan if she filed suit at an earlier date than she will be receiving as recovery from the Ojedas' and Pelham's respective bankruptcy estates. The bankruptcy court's finding that Gail failed to prove injury proximately caused by the omission is not clearly erroneous.

## II.    THE BANKRUPTCY COURT PROPERLY LIMITED 11 U.S.C. § 523(a)(2)(A) TO UNPAID INTEREST AND ATTORNEY'S FEES, BECAUSE THE OJEDAS DID NOT OBTAIN THE LOAN THROUGH FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD.

The bankruptcy court properly held that the loan principal should be excluded from the amount of potentially non-dischargeable debt. (Order at 16-17.) Because of the bankruptcy court's factual finding that Gail failed to establish the element of justifiable reliance and proximate cause, this Court need not consider Gail's second issue on appeal: that the whole amount of the debt previously owed to her could have been declared nondischargeable.

Gail argues that the allegedly nondischargeable debt consists of the original $600,000 principal loan amount, plus interest, attorney's fees and costs from the January 2006 date of default. Gail, however, conceded that the principal amount of the debt was not attributable to any fraudulent acts or misrepresentations by the Ojedas. The allegedly fraudulent schemes surrounding the Ojedas' failure to

disclose the sale of the Bank and the McDonald's restaurants occurred long after the loan funds had been disbursed. The bankruptcy court correctly observed:

> Section 523(a)(2)(A) provides that a debt is nondischargeable "*to the extent obtained by* . . . false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A) (emphasis added). Several courts have interpreted the emphasized language as providing that nondischargeability under § 523(a)(2)(A) is limited to the portion of a debt which is directly attributable to a false representation or fraud.

*FTC v. Austin* (*In re Austin*), 138 B.R. 898, 915 (Bankr. N.D. Ill. 1992); *Baytree National Bank & Trust Co. v. Christensen* (*In re Christensen*), Nos. 04 B 17486, 04 A 3646, 2005 Bankr. LEXIS 1509 at *14 (Bankr. N.D. Ill. Aug. 12, 2005). ("Non-dischargeability therefore is limited to that portion of the debt directly attributable to fraudulent acts.")

Therefore, the bankruptcy court found that since it was undisputed that the Ojedas did not obtain the original $600,000 loan by fraud, false pretenses, or false representations, "only the unpaid interest from January of 2006, plus attorney's fees and costs, which were not specified or quantified at trial, are potentially non-dischargeable." (Order at 17.) In sum, the bankruptcy court's legal conclusion regarding the potentially nondischargeable amount of the debt is correct and should be affirmed.

## **CONCLUSION**

The bankruptcy court's findings that Gail's reliance upon any omissions regarding the sale of the Bank and the McDonald's restaurants was not justified are not clearly erroneous. Similarly, the bankruptcy court's finding that Gail failed to prove proximate cause between any alleged injury and reliance on any omissions is

not clearly erroneous. Ernest and Beverly respectfully request this Court to affirm the bankruptcy court's Order and Judgment dated April 22, 2008, which held that their entire debt to Gail does not fall within the scope of the exception to discharge under 11 U.S.C. § 523(a)(2)(A).

Dated: August 26, 2008.                    ERNEST J. OJEDA & BEVERLY V. OJEDA

                                           By: /s/ Paul M. Bauch
                                                   One of Their Attorneys

Paul M. Bauch (ARDC # 6196619)
Carolina Y. Sales (ARDC #6287277)
BAUCH & MICHAELS, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, Illinois 60604
Office: (312) 588-5000
Fax: (312) 427-5709