# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GAIL GOLDBERG, | ) |
|     Plaintiff-Appellant, | ) |
| v. | ) Case No. 08 C 2808 |
| ERNEST J. OJEDA and BEVERLY V. OJEDA, | ) Judge Joan B. Gottschall |
|     Defendants-Appellees. | ) |

## MEMORANDUM OPINION AND ORDER

On January 2, 2007, Ernest and Beverly Ojeda filed for Chapter 7 bankruptcy protection. Gail Goldberg filed an adversary proceeding on March 28, 2007, seeking to have her loan to the Ojedas excepted from discharge. The Ojedas received a discharge pursuant to 11 U.S.C. § 727(a) on November 2, 2007, subject to resolution of the instant proceeding. The Bankruptcy Court conducted a three-day hearing, and issued a memorandum opinion and order on April 22, 2008, finding that Gail's debt is not excepted from discharge. *Goldberg v. Ojeda (In re Ojeda)*, 397 B.R. 67 (Bankr. N.D. Ill. 2008). Gail now appeals. This court heard oral arguments on March 3, 2009.

### BACKGROUND FACTS

Gail, and her husband Ronald Goldberg,[1] seek to have a debt owed by the Ojedas excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The debt was initiated by a note executed in 1998 ("1998 Note"). At that time, the Ojedas were restauranteurs, and were the sole shareholders of two Illinois corporations, Pelham Enterprises, Inc. ("Pelham"), and Dices, Inc. Pelham owned franchise rights, a real estate lease, and related personal property with respect to a McDonald's restaurant.

---

[1] The debt was originally manifested by a note in the name of both Ronald and Gail Goldberg. At a subsequent date the note was changed to only include Gail's name. However, Ronald remained an agent of Gail throughout the pendency of this action.

Dices, Inc. was a management company, and managed a second McDonald's restaurant. The franchise rights, real estate lease, and related personal property related to the second McDonald's restaurant were owned by Dices Enterprises, which was operated as a proprietorship by the Ojedas. The Ojedas were involved in the day-to-day operations of both restaurants.

Gail is a former high school teacher, and Ronald is a former deputy sheriff, police officer, entrepreneur in the wireless communications industry, and a current venture capitalist, having taken part in 25–30 short-term, high-risk loans since 1990. The Goldbergs and Ojedas met through a mutual acquaintance shortly before the 1998 Note was executed.

The 1998 Note, executed on August 6, 1998, extended the Ojedas a short-term bridge loan in the amount of $600,000, at an annual interest rate of 18%, with a maturity date of October 6, 1998. The 1998 Note was secured by 160,000 shares of "Pan American Bank" ("PAB") stock.[2] The Ojedas also provided the Goldbergs with a personal financial statement and a financial statement for Pelham and Dices Enterprises, though no additional security was provided.

The Ojedas immediately began making the required monthly interest payments, as they would continue to do for the next eight years. The October 6, 1998 maturity date of the 1998 Note came and went, but the Goldbergs did not call the loan. At some date in 1998, the Ojedas and Goldbergs executed a new, undated note payable to both Goldbergs which replaced the 1998 Note and extended the maturity date to December 1, 2000 ("Second Note"). Like the 1998 Note, the Second Note was secured by the 160,000 shares of stock. Beginning with the Second Note and continuing until the Ojedas' default, the Goldbergs sent monthly interest invoices to the Ojedas.

---

[2] The Ojedas did not own 160,000 shares of "Pan American Bank" stock, but rather 160,000 shares of Pan American Bankshares stock, itself a holding company whose sole asset was 100% of the shares of Pan American Bank. This discrepancy was clarified in later loan documents, and is not at issue in this action.

PAB began experiencing financial difficulties in 1998 or 1999, and Pan American Bancshares, the holding company that owned PAB, sold PAB to JD Financial on October 5, 1999. This transfer involved a one-for-one hundred share reverse stock split of the common shares of Bancshares, rendering the Ojedas' 160,000 shares virtually worthless. Pan American Bancshares was also required to change its name, and became Cermak Road Holdings, Inc. ("Cermak"). After the sale the Ojedas possessed only 1,600 shares of stock in Cermak. These events were not disclosed by the Ojedas to the Goldbergs.

The Goldbergs learned that PAB was experiencing problems by other means, and sought additional security from the Ojedas. On November 1, 2001, a new note was executed ("2001 Note") which replaced the Second Note. The 2001 Note contained identical principal and interest terms as the Second Note, but was between only Gail and the Ojedas, and was secured by separate corporate guarantees from Pelham and Dices, Inc., as well as by 160,000 shares of Bancshares stock.[3] Dices Enterprises did not provide a corporate guarantee on the 2001 Note. The 2001 Note matured on January 2, 2003. The January 2, 2003 maturity date came and went, but the Goldbergs continued sending the Ojedas monthly interest invoices, and the Ojedas continued making the monthly interest payments.

On October 1, 2004, Pelham and Dices Enterprises sold their interests in the two McDonald's restaurants for a combined purchase price of approximately $5,100,000. However, the Ojedas had a significant deferred capital gains tax, and after a portion of the sales proceeds were used to pay the restaurants' creditors, the remaining balance (a little over $1,000,000) was deposited in a "Starker Trust" pending investment in a like-kind asset that would permit the Ojedas to defer

---

[3] Of course, at this point the Ojedas possessed neither "Bancshares" stock, nor 160,000 shares in any company.

the capital gains tax.[4] None of the proceeds from the sales were used to pay the Goldbergs. Although the Ojedas no longer possessed any interests in any McDonald's restaurants after October 1, 2004, they continued to pay the Goldbergs with checks that continued to reference the McDonald's store formerly managed by Dices, Inc.

On December 31, 2004, Pelham entered into an asset purchase agreement related to Joey Buona's Pizzeria/Grille-Chicago L.L.C. ("Joey Buona's"), which closed in January, 2005. All remaining proceeds from the McDonald's sales were invested in Joey Buona's. This was not a successful enterprise, and Joey Buona's failed by February, 2006. Pelham filed for Chapter 7 bankruptcy in January, 2007.

The Ojedas defaulted on the 2001 Note in January, 2006. Prior to that date, and considering the 1998 Note, the Second Note, and the 2001 Note together, the Ojedas had made approximately 89 payments of interest with an aggregate value of around $801,000. The Ojedas never made any payments on the principal of the various Notes.

## PROCEDURAL HISTORY

The Ojedas filed for Chapter 7 bankruptcy on January 2, 2007. Gail filed an adversary proceeding on March 28, 2007, seeking to have her debt excepted from discharge. After an evidentiary hearing, the Bankruptcy Court first determined that the amount in controversy was limited to unpaid interest as of January of 2006, plus attorney's fees and costs, because the original

---

[4] Section 1031(a) of the Internal Revenue Code ("IRC") provides that "[n]o gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." IRC § 1031(a)(1). A deferred exchange allows the taxpayer to relinquish property currently held and receive like-kind replacement property in the future. Congress enacted § 1031(a) in 1984, partly in response to *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979). Placement of property into a "Starker Trust" allows a seller to complete a non-simultaneous property exchange and postpone recognition of capital gain taxes, so long as the exchange is completed within 180 days. § 1031(a)(3).

4

principal of $600,000 was not procured through fraud. *In re Ojeda*, 397 B.R. at 80. The Court then observed that there was no proof that the Gail's forbearance of the loan after the Ojedas had sold the two McDonald's restaurants in 2004 had resulted in any loss to Gail, because at that point in time there was no obvious collection remedy available. *Id.* at 81. The Court reasoned that although the sale had resulted in a profit, that profit could not be used to pay individuals who were not creditors of the restaurants without incurring significant tax liabilities that would have exhausted the sales profits. *Id.*

The Court then turned to the issues of fraud and justifiable reliance. The Court found that the Ojedas had misled the Goldbergs about the true nature of the Ojedas' financial situation regarding the devaluation of the Bancshares stock and the sale of the McDonald's stores, and that the Ojedas had created the false pretense that they continued to own the McDonald's stores. *Id.* at 84–85. However, the Court found that the Goldbergs' reliance on these frauds was not justifiable, noting that (1) the Goldbergs were aware of PAB's problems; (2) the Goldbergs sought additional security in the form of corporate guarantees from Pelham and Dices, Inc., but (a) they did not seek any updated financials from Pelham or from Dices, Inc., and (b) Dices, Inc. was a management corporation and had no assets; (3) this was to be a short-term two-month loan that ended up being extended for nearly eight years (and involved three separate notes, with three separate maturity dates, none of which the Ojedas satisfied); (4) that Ronald was a sophisticated venture capitalist; and (5) it was not justifiable for the Goldbergs to rely on the Ojedas' continued interest payments nor on financial statements that were by that time eight years old. *Id.* at 86–88.

Gail has appealed. Gail does not take issue with the Bankruptcy Court's conclusions regarding the lack of fraudulent inducement of the 1998 Note, the Second Note, and the 2001 Note. She focuses instead on the forbearance granted to the Ojedas starting in 2003 and continuing for the

5

life of the loan, on the Court's conclusion that the Gail did not justifiably rely on the Ojedas' fraud regarding the lack of disclosure of the sale of the McDonald's restaurants, and on the Court's finding that the value that could possibly be excepted from discharge is limited to unpaid interest as of January of 2006, plus attorney's fees and costs. Gail presents the following three issues for consideration on appeal:

> 1. Whether the Bankruptcy Court erred in finding that the debt owed by Defendants/Appellees to Plaintiff/Appellant is dischargeable and not excepted by 11 U.S.C. § 523(a)(2)(A);
>
> 2. Whether the Bankruptcy Court erred in finding that Goldberg did not meet the justifiable reliance element of proof required by 11 U.S.C. § 523(a)(2)(A); and
>
> 3. Whether the Bankruptcy Court erred in finding that only unpaid interest from January 2006, plus attorney's fees and costs, are potentially non-dischargeable.

Br. of Pl.-Appellant 1 (Doc. No. 16). This court heard oral arguments on March 3, 2009, and asked the parties to address the three issues identified by Gail, as well as the Bankruptcy Court's conclusion that Gail did not lose any collection remedies by granting the Ojedas a forbearance and therefore was not harmed by the Ojedas' fraud regarding the McDonald's sales.

## ANALYSIS

**I.**    **Legal Standards**

District courts "review [a] bankruptcy court's factual findings for clear error and its legal conclusions *de novo*." Fed. R. Bankr. P. 8013; *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994). Mixed questions of law and fact, including those related to reliance, are generally also reviewed for clear error. *Rovell v. Am. Nat'l Bank (In re Rovell)*, 194 F.3d 867, 871 (7th Cir. 1999). "A factual determination is clearly erroneous only if, after considering all of the evidence, [the reviewing court is] left with the definite and firm conviction that a mistake has been committed." *United States v. Groves*, 530 F.3d 506, 510 (7th Cir. 2008).

"The purpose of the [Bankruptcy] Code is to provide equitable distribution of the debtor's assets to the creditors and 'to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.'" *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (quotation omitted). The Code is construed "liberally in favor of the debtor and strictly against the creditor," but "bankruptcy protection and discharge may be denied to a debtor who was less than honest." *Id.* (quotations omitted). The party seeking an exception to discharge bears the burden of proof. *Goldberg Sec. v. Scarlata (In re: Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992).

## II. Proof of Loss

The court must first determine whether Gail has established that her collection remedy lost value as a result of the Ojedas' fraudulent conduct. When a debt is obtained by false pretenses, the debt may be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides as follows:

> A discharge under [the Bankruptcy Code] does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

§ 523(a)(2)(A). As the text of § 523(a)(2)(A) makes clear, the fraud must relate to money, property or services, or an extension, renewal, or refinancing of credit. The interpretation of fraud in this context has been given a broad scope, but the fraud must have resulted in some benefit to the debtor. *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); *Bremer Bank v. Wyss (In re Wyss)*, 355 B.R. 130, 136 (Bankr. W.D. Wis. 2006) ("[T]he statute is designed to prevent a debtor from benefitting from fraudulent conduct and then seeking a discharge in bankruptcy."); *id.* ("So the question must be asked: presupposing the veracity of the plaintiff's evidence, and assuming the

7

debtors [committed a fraud], what item of value did they obtain from the creditor?"). With this benefit requirement in mind, a creditor must show three things to prevail on a fraudulently-induced forbearance claim. It "must demonstrate that it had valuable collection remedies at the time of the misrepresentation, that it did not exercise those remedies based upon the misrepresentation, and that those remedies lost value during the extension period." *Wyss*, 355 B.R. at 136 (citing *Locke v. U.S. Trustee (In re Locke)*, 205 B.R. 592, 598 (9th Cir. 1996)). This is the creditor's burden, though "inferential evidence is expected and will be sufficient." *Freer v. Beetler (In re: Beetler)*, 368 B.R. 720, 731–32 (Bankr. C.D. Ill. 2007) (citations omitted); *see also In re: Scarlata*, 979 F.2d at 524 (creditor bears burden of proof of exception to discharge); *Wyss*, 355 B.R. at 136 ("a creditor . . . must demonstrate . . . .").

The Bankruptcy Court made a factual finding that "there is no proof that Gail's forbearance lost any value or that it cost her anything." *In re Ojeda*, 397 B.R. at 81. The Court based this finding on several factors, most notably the testimony of Earnest Ojeda that if the Ojedas had used any of the proceeds of the McDonald's sales to pay Gail (or anybody other than creditors of the restaurants being sold), "the Ojedas would have lost the tax deferral benefit of [Internal Revenue Code] § 1031 and all sale proceeds would be subject to tax claims of the government ahead of Gail's claim," exhausting all the sales profits. *Id.* This is a factual conclusion, and may be set aside only if this court is "left with the definite and firm conviction that a mistake has been committed." *Groves*, 530 F.3d at 510.

The record is replete with testimony from the Ojedas that they would have faced tax liabilities if they had attempted to use the sales proceeds to pay Gail. *See* Feb. 26, 2008 Tr. 9:22–10:1 (Earnest testifying that if money had not been invested in Starker Trust, it "would have been taxable, and we would have been left with literally zero"), 24:8 ("It would have gone to taxes

. . ."), 28:20–22 ("We had to invest everything that we received. The tax liability was greater than the $2.3 million [earned from the sale], if that's what you're asking"), 36:25–37:2 ("Q: You didn't pay any capital gains tax as a result of completing the exchange? A: No."); Feb. 27, 2008 Tr. 31 14–17 (testifying that if Starker Trust had not been used, the remaining money after taxes "would have been . . . down to zero"). However, the Ojedas' testimony of the magnitude of the dire tax consequences is not borne out by the evidence of their own conduct with the proceeds from the sale. Over $1.1 million was not deposited into the Starker Trust. *See* Feb. 27, 2008 Tr. 22:4–23:16 (discussing $411,081); 24:24–25:28 (discussing $738,877). These funds were used to wind down the businesses, to pay off remaining payables (including outstanding taxes), and to pay salary and benefits for staff formerly employed with McDonald's and who agreed to stay on for the Ojedas' new venture. *See* Feb. 27, 2008 Tr. 21:9–23, 28:20–30:01, 30:23–31:13, 51:22–52:12. However, these funds—indeed, all funds that were not deposited into the Starker Trust—were taxed. *See* 26 U.S.C. 1031(c) (noting that any proceeds from sale used for anything beside like-kind exchange is taxable); Feb. 27, 2008 Tr. 29:7–17 (Earnest testifying that all money not deposited in the Starker Trust was taxed—even including money specifically withheld to pay taxes).[5] There is no

---

[5] The transcript reads as follows:

> Q: And isn't it a fact that one of the problems with a 1031 Exchange is that any money you took out of the sale, even to pay expenses, you had to pay tax on?
> A: That was probably something that bothered me the most, was the more money we took out to pay taxes, we were taxed on the money that was coming out to pay the taxes. So we not only paid the tax that was projected to be payable [for winding down the business], but we had to pay another tax on that money to pay those taxes, if that makes sense. . . . .
> Q: So --
> THE COURT: Is that the flip-side of the downside of taking depreciation deductions?
> [ATTORNEY] BAUCH: It is, Your Honor.
> THE COURT: That's what I figured.

9

explanation in the record for why any part of this $1.1 million could not have been used to pay off the debt to Gail before it was ultimately lost in the Joey Buona's venture—a tax penalty would certainly have been incurred, but no more so than the Ojedas were already being required to pay for failing to deposit those funds into the Starker Trust.

The Ojedas also testified that, after they had purchased Joey Buona's, they took out a second mortgage on their home, and invested the proceeds—in excess of $300,000—into their new business. Feb. 26, 2008 Tr. 21:20–24. Again, there is no explanation in the record as to why these funds could not have been used, in part, to pay down the debt before it was ultimately lost in the Joey Buona's venture.

Finally, Earnest Ojeda testified that his financial condition was significantly worse in February, 2006 than it was in October, 2004. Feb. 27, 2008 Tr. 17:21–24. Though this is not direct evidence that the Ojedas would have been better able to pay Gail if Gail had called the loan, that is certainly a reasonable—and appropriate—inference.

Based on these three pieces of evidence in the record,[6] this court cannot agree with the Bankruptcy Court's conclusion that Gail put forth no evidence that her collection remedy had lost any value. Although ambiguity remains regarding whether the principal could have been paid in its entirety in October, 2004, there is every reason to believe that Gail would have been in a stronger position to collect in October, 2004 than she was in February, 2006. *See In re: Beetler*, 368 B.R. at 731–32. This court concludes that the Ojedas' false pretenses caused Gail to lose at least some of the value of her collection remedy.

---

Feb. 27, 2008 Tr. 29:7–22.

[6] Gail also notes that the Ojedas sent their accountant on a vacation after the McDonald's sales. However, the record does not reflect how much was expended on this vacation.

**III.    Justifiable Reliance**

The Court must next consider whether the Bankruptcy Court's conclusion that Goldberg's reliance on the Ojedas' false pretenses regarding the McDonald's sales was justifiable. Again, the issue of justifiable reliance is reviewed for clear error. *In re Rovell*, 194 F.3d at 871.

The meaning of the term "justifiable reliance" was addressed in *Field v. Mans*, 516 U.S. 59, 74–75 (1995). The Court instructed that justifiable reliance is a relative, non-objective standard. "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71 (quotations omitted). However, the Court went on to observe that creditors have no duty to investigate under this theory, unless the falsity of the representation is readily apparent. *Id.* at 70–72. Nevertheless, a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 72.

The Bankruptcy Court found that Ronald, the agent of plaintiff Gail, was a sophisticated venture capitalist, having been involved in 25–30 high-risk short-term loans, and having himself run a company with multi-million annual profits. The Ojeda debt was to have been a short, two-month loan, but stretched out over an eight-year period during which time the note matured three times without payment, the last maturity date being January, 2003, and during which time the Ojedas obviously had failed to move the loan to a more traditional bank creditor, who would have charged lower interest rates, but demanded greater security and confidence in the resolution of the loan. Ronald was aware of problems related to the original security—the 160,000 shares of PAB stock—in 1999, but responded only by obtaining corporate guarantees without any proof of the corporations' financial status. No security interest in the corporations, or the McDonald's stores,

11

was ever obtained. The Goldbergs also failed to request updated financials at any point during this eight-year period. The Bankruptcy Court's conclusion that this behavior on the part of the Goldbergs was *unreasonable* cannot be disputed. *In re Ojeda*, 397 B.R. at 87. But this is not the controlling standard.

Justifiable reliance is an intermediate standard, requiring less than reasonable reliance, but more than reliance in fact. *Field*, 516 U.S. at 72–74. The standard is a relative standard that must take into consideration Ronald's sophistication, but Ronald's particular abilities are only relevant to the extent that Ronald was given evidence of a representation or falsity. For example, because of Ronald's particulars, a court can examine more closely whether Ronald justifiably relied on, say, the Ojedas personal financial statement, as compared to a creditor who has no prior business or banking experience.[7] *Field* makes clear that creditors have no duty to investigate if they are not aware of a possible falsity. *Field*, 516 U.S. at 70–72. Here, Ronald was on notice of certain improprieties back in 1999, but there is no evidence in the record that he willfully ignored evidence that the McDonald's stores were being sold: while the checks used to pay the Goldbergs no longer contained the McDonald's logo, they continued to bear the McDonald's store number and street

---

[7] The long quotation in *Field v. Man* from the Restatement (Second) of Torts (1976) makes this point clear, noting that a person is:

> required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. *On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.*

*Field*, 516 U.S. at 71 (quoting Restatement (Second) Torts§ 541, cmt. a) (emphasis added).

address. This is insufficient notice. Nor can this court agree that the expanded length of the loan was sufficient. Again, the Goldbergs possibly acted unreasonably, but this is not the same as concluding that they willfully ignored evidence that the Ojedas had made misrepresentations.

Because the standard for justifiable reliance is less demanding than the standard for reasonable reliance, this court concludes that Gail's reliance was justifiable.

## IV. Amount Excepted from Discharge

Non-dischargeability is limited to the portion of the debt directly attributable to false pretenses, a false representation, or fraud. For example, in *FTC v. Austin (In re Austin)*, 138 B.R. 898 (Bankr. N.D. Ill. 1992), the parties had agreed to a fully-compensable settlement amount of $625,000, but the debtor defaulted on that payment, resulting in an additional $875,000 in default penalties. *Id.* at 915. The court reasoned that only the original $625,000 was directly attributable to the fraud, and the remaining default penalty would not be excepted from discharge. *Id.* The *Austin* court cited *Palmer v. Levy (In re Levy)*, 951 F.2d 196, 198 (9th Cir. 1991), which made a similar determination regarding punitive damages, reasoning that punitives are by definition not compensatory. *In re Levy*, 951 F.2d at 198.

> In this matter, the Bankruptcy Court reached the following legal conclusion:
>
> In the matter at bar, it is undisputed that the Ojedas did not obtain the original $600,000 principal by fraud, false pretenses, or false representations. Thus, only the unpaid interest from January of 2006, plus attorney's fees and costs, which were not specified or quantified at trial, are potentially non-dischargeable.

*In re Ojeda*, 397 B.R. at 80. There is no dispute as to the Court's factual finding that the original principal was not advanced due to fraud, but there is a dispute as to the legal conclusion that recovery should be limited to interest after January of 2006, plus attorney's fees and costs. This legal conclusion is reviewed *de novo*.

13

The Ojedas' fraud resulted in a forbearance, not a separate loan. The forbearance was for the entire principal of the original note—by granting the forbearance, Gail did not agree to forego collection of all or part of the principal, nor did she agree to receive only interest payments. The situation in *In re Austin* and *In re Levy* was quite different. In those cases the amount due to the creditors was enhanced due to events unrelated to the fraudulent conduct—namely, a subsequent default penalty that was assessed *after* the parties had already determined the injury to the creditors, and a punitive damages award which was not assessed to punish the tortfeasor. These cases do not support the conclusion that only the interest post-default, plus attorney's fees and costs, should be recoverable. Indeed, the only reason interest payments were due after January, 2006, is because the Ojedas had not yet paid off the principal. This court concludes that where a creditor forbears to call a loan due to fraud, the principal, as well as any interest, is excepted from discharge.

This record does not include any evidence as to the amount of interest or the amount of relevant attorney's fees and costs that is now due. This issue is remanded for determination by the Bankruptcy Court.

## CONCLUSION

For the reasons stated above, the decision of the Bankruptcy Court is reversed. The case is remanded for further proceedings consistent with this opinion.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 17, 2009